(808 P.2d 896)

No. 64,973

MICHAEL E. KVASSAY, d/b/a Kvassay Exotic Foods, *Appellant/ Cross-Appellee*, v. ALBERT MURRAY, *et al.*, *Appellees/Cross-Appellants*.

Opin-
ion filed April 5, 1991.

*Hal D. Meltzer*, of Turner and Boisseau, Chartered, of Overland Park, and *Allen G. Glendenning*, of Turner and Boisseau, Chartered, of Great Bend, for the appellant.

*Joseph Seiwert*, of Law Offices of Larry Wall, of Wichita, for the appellees.

Before BRISCOE, C.J., LEWIS, J., and RICHARD B. WALKER, District Judge, assigned.

WALKER, J.: Plaintiff Michael Kvassay, d/b/a Kvassay Exotic Food, appeals the trial court's finding that a liquidated damages clause was unenforceable and from the court's finding that damages for lost profits were not recoverable. Kvassay contends these damages occurred when Great American Foods, Inc., (Great American) breached a contract for the purchase of baklava. Great American and Albert and Deana Murray, principals of Great American, cross-appeal the trial court's ruling that Kvassay could pierce Great American's corporate veil to collect damages awarded at trial.

On February 22, 1984, Kvassay, who had been an independent insurance adjuster, contracted to sell 24,000 cases of baklava to Great American at $19.00 per case. Under the contract, the sales were to occur over a one-year period and Great American was to be Kvassay's only customer. The contract included a clause which provided: "If Buyer refuses to accept or repudiates delivery of the goods sold to him, under this Agreement, Seller shall be

entitled to damages, at the rate of $5.00 per case, for each case remaining to be delivered under this Contract."

Problems arose early in this contractual relationship with checks issued by Great American being dishonored for insufficient funds. Frequently one of the Murrays issued a personal check for the amount due. After producing approximately 3,000 cases, Kvassay stopped producing the baklava because the Murrays refused to purchase any more of the product.

The Murrays formed Sunshine Ceramics, Inc., in 1974. The company was inactive during the late 1970's and early 1980's and failed to make a number of required corporate filings. In August 1984, the name of the corporation was changed to Great American Foods, Inc. The Murrays also operated fast food restaurants in Wichita under the name of Great American Subs, Inc., and controlled an entity named Murray Investments. The Murrays conducted business for all of their entities and personal business from one street location in Wichita. In August 1984, the Murrays opened a bank account in the name of Great American Distributors, Inc., although no incorporation papers were ever filed. The Murrays frequently paid the bills of their various entities with personal checks and often wrote checks to themselves on corporate accounts. In addition, there were times when one entity would pay the Murrays' personal expenses or the expense of other Murray entities.

In April 1985, Kvassay filed suit for damages arising from the collapse of his baklava baking business. Great American counterclaimed and, in May 1988, the trial court sustained a defense motion to bifurcate the case. The court conducted bench hearings on the validity of the liquidated damages clause and the question of piercing the corporate veil. The trial court ruled that liquidated damages could not be recovered and that Great American's corporate veil could be pierced by Kvassay. The court also held "as a matter of law" that Kvassay would not be able to recover damages for lost profits in the action because they were too "speculative and conjectural." Kvassay attacked this latter ruling through a motion to modify, arguing a ruling on the issue was premature. The motion to modify was denied, although the court did announce that Kvassay could attempt to prove loss of profits at the jury trial.

A jury trial on the issues of breach of contract and damages was held in February 1990. On the second day of trial, before any evidence on the question of loss of profits had been presented, the trial court ruled that lost profits were not recoverable and barred Kvassay from presenting any evidence on that question. The jury returned verdicts in Kvassay's favor and awarded him a total of $35,673.99.

Kvassay first attacks the trial court's ruling that the amount of liquidated damages sought by him was unreasonable and therefore the liquidated damages clause was unenforceable.

Kvassay claimed $105,000 in losses under the liquidated damages clause of the contract, representing $5 per case for the approximately 21,000 cases of baklava which he was not able to deliver. The trial court determined that Kvassay's use of expected profits to formulate liquidated damages was improper because the business enterprise lacked duration, permanency, and recognition. The court then compared Kvassay's previous yearly income (about $20,000) with the claim for liquidated damages ($105,000) and found "the disparity becomes so great as to make the clause unenforceable."

Since the contract involved the sale of goods between merchants, the Uniform Commercial Code governs. See K.S.A. 84-2-102. "The Code does not change the pre-Code rule that the question of the propriety of liquidated damages is a question of law for the court." 4 Anderson, Uniform Commercial Code § 2-718:6, p. 572 (3d ed. 1983). Thus, this court's scope of review of the trial court's ruling is unlimited. *Hutchinson Nat'l Bank & Tr. Co. v. Brown*, 12 Kan. App. 2d 673, 674, 753 P.2d 1299, *rev. denied* 243 Kan. 778 (1988).

Liquidated damages clauses in sales contracts are governed by K.S.A. 84-2-718, which reads in part:

"(1) Damages for breach by either party may be liquidated in the agreement but only at an amount which is reasonable in the light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy. A term fixing unreasonably large liquidated damages is void as a penalty."

To date, the appellate courts have not interpreted this section of the UCC in light of facts similar to those presented in this case.

In ruling on this issue, the trial court relied on rules governing liquidated damages as expressed in *U.S.D. No. 315 v. DeWerff*, 6 Kan. App. 2d 77, 626 P.2d 1206 (1981). *DeWerff*, however, involved a teacher's breach of an employment contract and was not governed by the UCC. Thus, the rules expressed in that case should be given no effect if they differ from the rules expressed in 84-2-718.

In *DeWerff*, this court held a "stipulation for damages upon a future breach of contract is valid as a liquidated damages clause if the set amount is determined to be reasonable and the amount of damages is difficult to ascertain." 6 Kan. App. 2d at 78. This is clearly a two-step test: Damages must be reasonable and they must be difficult to ascertain. Under the UCC, however, reasonableness is the only test. K.S.A. 84-2-718. K.S.A. 84-2-718 provides three criteria by which to measure reasonableness of liquidated damages clauses: (1) anticipated or actual harm caused by breach; (2) difficulty of proving loss; and (3) difficulty of obtaining an adequate remedy.

In its ruling, the trial court found the liquidated damages clause was unreasonable in light of Kvassay's income before he entered into the manufacturing contract with Great American. There is no basis in 84-2-718 for contrasting income under a previous unrelated employment arrangement with liquidated damages sought under a manufacturing contract. Indeed, the traditional goal of the law in cases where a buyer breaches a manufacturing contract is to place the seller "'in the same position he would have occupied if the vendee had performed his contract.'" *Outcault Adv. Co. v. Citizens Nat'l Bank*, 118 Kan. 328, 330-31, 234 Pac. 988 (1925). Thus, liquidated damages under the contract in this case must be measured against the anticipated or actual loss under the baklava contract as required by 84-2-718. The trial court erred in using Kvassay's previous income as a yardstick.

Was the trial court correct when it invalidated the liquidated damages clause, notwithstanding the use of an incorrect test? If so, we must uphold the decision even though the trial court relied on a wrong ground or assigned an erroneous reason for its decision. *Sutter Bros. Constr. Co. v. City of Leavenworth*, 238 Kan. 85, 93, 708 P.2d 190 (1985). To answer this question, we

must look closer at the first criteria for reasonableness under 84-2-718, anticipated or actual harm done by the breach.

Kvassay produced evidence of anticipated damages at the bench trial showing that, before the contract was signed between Kvassay and Great American, Kvassay's accountant had calculated the baklava production costs. The resulting figure showed that, if each case sold for $19, Kvassay would earn a net profit of $3.55 per case after paying himself for time and labor. If he did not pay himself, the projected profit was $4.29 per case. Nevertheless, the parties set the liquidated damages figure at $5 per case. In comparing the anticipated damages of $3.55 per case in lost net profit with the liquidated damages of $5 per case, it is evident that Kvassay would collect $1.45 per case or about 41 percent over projected profits if Great American breached the contract. If the $4.29 profit figure is used, a $5 liquidated damages award would allow Kvassay to collect 71 cents per case or about $16\frac{1}{2}$ percent over projected profits if Great American breached the contract.

An examination of these pre-contract comparisons alone might well lead to the conclusion that the $5 liquidated damages clause is unreasonable because enforcing it would result in a windfall for Kvassay and serve as a penalty for Great American. A term fixing unreasonably large liquidated damages is void as a penalty under 84-2-718.

A better measure of the validity of the liquidated damages clause in this case would be obtained if the actual lost profits caused by the breach were compared to the $5 per case amount set by the clause. However, no attempt was made by Kvassay during the bench trial to prove actual profits or actual costs of production. Thus, the trial court could not compare the $5 liquidated damages clause in the contract with the actual profits lost by the breach. It was not until the jury trial that Kvassay attempted to prove his actual profits lost as part of his damages. Given the trial court's ruling that lost profits were not recoverable and could not be presented to the jury, it is questionable whether the court would have permitted evidence concerning lost profits at the bench trial.

The trial court utilized an impermissible factor to issue its ruling on the liquidated damages clause and the correct statutory factors were not directly addressed. We reverse the trial court on this issue and remand for further consideration of the reasonableness of the

liquidated damages clause in light of the three criteria set out in 84-2-718 and our ruling on recoverability of lost profits which follows.

Kvassay contends the trial court erred in ruling damages for lost profits were not recoverable, arguing under K.S.A. 84-2-608 he should have been permitted to collect lost profits under his contract with Great American. As noted, the trial court made this ruling prior to hearing any evidence on the issue of lost profits.

In ruling that Kvassay could not recover lost profits, the court held:

1. The UCC and case law governing lost profits do not apply to "loss of future profits for uncompleted goods under a contract."

2. When the rules governing lost profits do apply, "you have to have an established business, one which meets those other criteria, sufficient length of time that future profits can be reasonably assured by reason of the past history of the business to have been realized or realizable under the contract."

3. "[A]s a matter of law . . . this bakery business was not in existence a sufficient length of time that the calculation of future profits is sufficiently reliable to be a basis for the recovery of damages."

As previously discussed, damages in this case are governed by the UCC and the trial court erred in finding the UCC did not apply. The general rule governing damages is expressed in K.S.A. 84-1-106(1): "The remedies provided by this act shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed." The specific section governing lost profits is K.S.A. 84-2-708, which states:

"(1) Subject to subsection (2) and to the provisions of this article with respect to proof of market price (section 84-2-723), the measure of damages for nonacceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in this article (section 84-2-710), but less expenses saved in consequence of the buyer's breach.

"(2) If the measure of damages provided in subsection (1) is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this article (section 84-2-710), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale."

A plain reading of this statute leads to the conclusion that section (2) applies in this case because there was no market for Kvassay's baklava after Great American breached the contract. However, this determination does not resolve the question of the trial court's ruling that lost profits cannot be obtained for goods not yet produced. While no Kansas court has interpreted 84-2-708(2), one authoritative treatise on the UCC provides guidance. "When the seller is entitled to recover for loss of profits, he may recover for the profit on that part of the order of goods which has not yet been manufactured by him." 4 Anderson, Uniform Commercial Code § 2-708:22, p. 395.

Setting aside for a moment the question of Kvassay's business experience, Kansas common law is in accord with Anderson on the question of recoverability of loss of profits on goods not yet manufactured:

"'In considering the question what damages may be recovered by the vendor in case of the breach by the vendee of a contract for the purchase and sale of articles *to be manufactured*, it must be borne in mind that the aim of the law is to place the vendor in the same position he would have occupied if the vendee had performed his contract. If this object is to be attained, it is evident that the vendor must be permitted to recover the profits which he would have made if there had been no breach of the contract.'" *Outcault*, 118 Kan. at 330-31.

*Outcault* is cited favorably in the Kansas comment to 84-2-708. Thus, it is clear the trial court also erred in ruling profits were not obtainable for goods that had not been produced.

The next question in this analysis becomes whether a business must have been in existence for a "sufficient length of time that future profits can be reasonably assured by reason of the past history of the business to have been realized or realizable under the contract," as found by the trial court. The official UCC comment to 84-2-708 states: "It is not necessary to a recovery of 'profit' to show a history of earnings, especially if a new venture is involved." By this standard, Kvassay did not need to prove a record of profitability to claim lost profits under the UCC and the trial court erred in so ruling.

The closely related final question is whether the trial court erred in ruling "as a matter of law . . . this bakery business was not in existence a sufficient length of time that the calculation of

future profits is sufficiently reliable to be a basis for the recovery of damages." The role of the courts in determining the acceptability of proof of lost profits for new businesses has been discussed in Kansas. See *Butler v. Westgate State Bank,* 226 Kan. 581, 602 P.2d 1276 (1979); *Vickers v. Wichita State University,* 213 Kan. 614, 518 P.2d 512 (1974); *Outcault,* 118 Kan. 328. Although none of these cases discusses lost profits for new businesses in light of the UCC, they are instructive. *Vickers,* 213 Kan. at 620, contains this comment:

"Unquestionably, a method of establishing a loss of profits with reasonable certainty is by showing a history of past profitability. Past profitability of a particular business is not, however, the only method of proving lost future profits. The evidence necessary in establishing lost future profits with reasonable certainty 'must depend in a large measure upon the circumstances of the particular case. . . .' [Citation omitted.] Absolute certainty in proving loss of future profits is not required. [Citation omitted.] What is required is that the court or jury be guided by some rational standard. [Citations omitted.] As to evidentiary matters a court should approach each case in an individual and pragmatic manner, and require the claimant furnish the best available proof as to the amount of loss that the particular situation admits. [Citation omitted.] It is the responsibility of a district court to see that speculative and problematical evidence does not reach the jury. [Citation omitted.]"

There is no reason the standard should be any different under the UCC section which specifically allows lost profits as damages (84-2-708) and which requires that remedies under the act be "liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed." K.S.A. 84-1-106.

Lost profits may be recovered for new businesses if they can be proved with reasonable certainty. *Butler,* 226 Kan. at 585. Strict application of the certainty doctrine would place a new business at substantial disadvantage. To hold recovery is precluded as a matter of law merely because a business is newly established would encourage those contracting with such a business to breach their contracts. The law is not so deficient. *Vickers,* 213 Kan. at 620. When 84-1-106 and 84-2-708(2) are read in light of *Vickers,* it is clear that, when there has been a breach of contract with a new business, such business should be given an

opportunity to prove its damages and to collect profits if the damages can be proved.

In this case, Kvassay attempted to present an ample basis on which to determine profits earned on the baklava produced under the contract. Uncontested evidence offered included:

1. Kvassay did not go into the bakery business until he had a contract with Great American requiring the purchase of 24,000 cases of baklava at $19 per case.

2. After spending about two months setting up his bakery, Kvassay produced baklava full time for about three months, although there were some temporary shut-downs due to cash flow problems.

3. Production was averaging about 100 cases daily, although a peak of 150 cases was reached.

4. 3,000 cases of the 24,000 contracted for were produced, or 12.5 percent of the contract.

5. Production staff was paid on a commission basis based on the number of trays of baklava prepared at a rate of $1.75-$2.00 per tray.

6. The recipe for each 14-inch × 18-inch tray of baklava called for two pounds of phyllo dough, one pound of margarine, one teaspoon of cloves, one teaspoon of cinnamon, one pound of walnuts, and two pounds of honey.

7. Each tray produced ten 8-ounce pieces of baklava while each case delivered held twelve 8-ounce pieces of baklava.

8. There were two full-time hourly employees and additional help was hired on an hourly basis for maintenance when needed.

In addition, before the court ruled that lost profits could not be proved, Kvassay attempted to offer receipts from suppliers to document his costs. The trial court never permitted those exhibits to be admitted. Further, after the court ruled that lost profits would not be allowed, Kvassay proffered the testimony of two accountants as to the profitability of his enterprise and the profit he would have earned under the contract with Great American. Of particular note was the testimony of Tom Dechant, C.P.A., who testified that, from an accounting standpoint, at least five percent of the baklava contract needed to be completed before profits could be determined with "reasonable certainty." In this case, 12.5 percent of the contract had been completed.

Given the quantity of evidence offered to prove the profitability of Kvassay's business, it is clear the trial court was premature in ruling, as a matter of law, that lost profits could not be proved. Kvassay should have been permitted to offer his evidence and meet his burden of proof on damages.

On cross-appeal, Great American contends the trial court was wrong in permitting its corporate veil to be pierced so the Murrays could be held personally responsible for the corporate debts. The crux of Great American's argument is that no fraud or injustice was done to Kvassay and there is no "causal nexus" between Kvassay's decision to enter into the contract and the corporate failings which came to light during the trial. Kvassay argues the evidence is compelling and overwhelmingly supports the trial court's finding that the corporate entity involved operated as a "facade for the operations of the Murrays" and worked to Kvassay's injustice "by inducing him to enter into the contract" at issue.

Each case involving disregard of the corporate entity must rest upon its special facts. *Sampson v. Hunt*, 233 Kan. 572, 579, 665 P.2d 743 (1983).

"Where the trial court has made findings of fact . . . the function of this court on appeal is to determine whether the findings are supported by substantial competent evidence . . . . Substantial evidence is evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved. [Citation omitted.]" *Williams Telecommunications Co. v. Gragg*, 242 Kan. 675, 676, 750 P.2d 398 (1988).

Before examining the record to determine if there is sufficient competent evidence to support the trial court's decision, it is helpful to understand when Kansas courts have determined that piercing the corporate veil is appropriate.

"We start with the basic premise that a corporation and its stockholders are presumed separate and distinct, whether the corporation has many stockholders or only one. Debts of a corporation are not the individual indebtedness of its stockholders. However, in an appropriate case the corporate form will be disregarded and the corporation and its stockholders may be treated as identical. [Citations omitted.] Power to pierce the corporate veil is to be exercised reluctantly and cautiously. [Citations omitted.]" *Amoco Chemicals Corporation v. Bach*, 222 Kan. 589, 593, 567 P.2d 1337 (1977).

"The doctrine of alter ego is used to impose liability on the individual who uses a corporation merely as an instrumentality to conduct his own personal business. Such liability arises from fraud or injustice perpetrated not on the corporation but on third persons dealing with the corporation. Under it the court merely disregards the corporate entity and holds the individual responsible for his acts knowingly and intentionally done in the name of the corporation. [Citation omitted.]" *Sampson*, 233 Kan. at 579.

In determining whether disregarding the corporate entity is appropriate, eight factors have been considered:

"(1) undercapitalization of a one-man corporation, (2) failure to observe corporate formalities, (3) nonpayment of dividends, (4) siphoning of corporate funds by the dominant stockholder, (5) nonfunctioning of other officers or directors, (6) absence of corporate records, (7) the use of the corporation as a facade for operations of the dominant stockholder·or stockholders, and (8) the use of the corporate entity in promoting injustice or fraud." *Sampson*, 233 Kan. 572, Syl. ¶ 3.

The trial court made several factual findings which, when considered in light of the eight factors, provide sufficient foundation for disregarding the corporate entity.

1. *Undercapitalization of the corporation.*

The trial court found that, while the Murrays loaned approximately $250,000 to Great American from mid-1983 until the end of 1984, the infusions of cash were made on an "as needed" basis. Further, sometimes the loans were deposits in corporate accounts while at other times the Murrays simply paid corporate debts from their personal accounts. The record is filled with evidence to support these findings. An audit completed at the end of 1984 showed Great American's total corporate funding included $15,000 in common stock and $21,728 in "[c]ontributed capital in excess of par value." In addition, the corporation held inventory valued at $160,371 and property and equipment valued at approximately $38,000. When $37,000 in original capital investment in Great American is viewed in light of the fact that Kvassay's contract required that Great American pay $456,000 in one year and the Murrays only loaned the company funds when shortages occurred, it is clear there is substantial evidence in the record to support the conclusion that the corporation was "never capitalized, except on a haphazard and as needed basis."

2. *Failure to observe corporate formalities.*

The trial court concluded the Murrays failed to observe corporate formalities, basing its decision in part on the absence of a number of required corporate records, as well as a complete failure to record most of the financial transactions between the Murrays and their various entities. Further, the court noted Great

American failed to file annual corporate reports for 1983 and 1984 with the Secretary of State until October 1985. The court also noted that, while the Murrays started Great American Distributors to conduct the business of Great American Foods, there was never any effort to change Great American Foods' corporate name or to register Great American Distributors. Since each of the findings is supported by evidence offered at trial and included in the record on appeal, there is substantial competent evidence to show Great American Foods and the Murrays failed to abide by general corporate formalities.

### 3. *Nonpayment of dividends.*

There is no evidence in the record that dividends were ever paid by Great American.

### 4. *Siphoning of corporate funds by the dominant stockholder.*

The trial court noted that no ledgers or journals of expenses paid or income received were maintained by Great American Foods or by Great American Subs and that accounting records for the firm were reconstructed on the basis of checks issued, without any accompanying invoices or receipts, making it impossible to determine what the corporate payments covered. The court did note that Great American paid health club dues for the Murrays. The Murrays received a number of payments from Great American but the court noted that, since no employment contracts existed between the Murrays and Great American, it was impossible to determine the reasonableness or basis of such payments. In addition, the trial court found that Deana Murray withdrew $6,000 on September 2, 1983, from Great American Foods, and Albert Murray withdrew $1,500 on September 24, 1984, from Great American Distributors. Albert testified that he and his wife frequently paid the bills of their various corporations with personal checks and often wrote themselves checks on corporate accounts. In addition, there were times when the corporations would pay the Murrays' personal expenses or expenses of other Murray corporations. The trial court also noted that, on August 31, 1984, Great American Distributors obtained a line of credit, of which $25,000 was deposited in Great American Subs'

account. The same day, Great American Subs deposited $26,000 in a Great American Distributors' account.

5. *Nonfunctioning of other officers or directors.*

This factor is not at issue here since there were no directors other than the Murrays.

6. *Absence of corporate records.*

The complete absence of a number of corporate records has already been discussed.

7. *Use of corporation as facade for operations of dominant stockholders.*

The trial court specifically found the Murrays used their various corporations as a facade to conduct their personal business. A number of factors already discussed, including the Murrays' complete failure to keep corporate records or to abide by corporate formalities, combined with the history of unexplained transfers of funds, provide ample evidence on which the court could base its conclusion. In addition, it was undisputed at trial that the Murrays conducted business for all of their entities and personal business from one street address in Wichita.

8. *Use of corporate entity in promoting injustice or fraud.*

The trial court found the Murrays used the corporation as a facade for their own interests and, in doing so, "worked to the injustice of the plaintiff by inducing him to enter into the contract." Great American focuses most of its argument that the corporate veil should not be pierced on this point, arguing specifically there must be proof that control of the corporation was used to commit fraud or to perpetrate a wrong and that there is no such proof.

Great American's emphasis is misplaced. Injustice alone will support a disregard of the corporate entity. See *Kilpatrick Bros., Inc. v. Poynter*, 205 Kan. 787, 797, 473 P.2d 33 (1970). As discussed, there is ample evidence in the record to support the finding that the Murrays operated their corporations as alter egos, putting cash in when convenient and removing it when equally convenient. The Murrays conducted business with such unity of interest and ownership that the separate personalities of the cor-

porations and themselves no longer existed. See *Poynter*, 205 Kan. at 798.

In effect, it was the Murrays together with Great American who breached the contract with Kvassay. If that breach was considered an act of Great American alone, "an inequitable result would follow" because Kvassay would be unable to collect damages to which he is entitled. See *Poynter*, 205 Kan. at 798. While the power to pierce the corporate veil is to be exercised reluctantly and cautiously, the corporate entity can be disregarded if it is used to cover fraud or to work injustice, or if necessary to achieve equity. *Service Iron Foundry, Inc. v. M.A. Bell Co.*, 2 Kan. App. 2d 662, 673, 588 P.2d 463 (1978).

Great American cites a number of cases from other states for the principle that a breach of contract is insufficient to establish the requisite injustice to allow piercing the corporate veil. A review of Kansas cases, however, clearly shows it is appropriate to pierce the veil to prevent injustice or to achieve equity and it does not matter what kind of action is involved. See *Poynter*, 205 Kan. at 798; *Service Iron*, 2 Kan. App. 2d at 673.

Great American is correct in its assertion that there is nothing in the record to support the finding that Kvassay relied on Great American's corporate status in entering into the baklava contract. However, the injustice that would result in this case is sufficient to support a determination to pierce the corporate veil. Thus, the trial court's determination was correct for the wrong reason. See *Sutter Bros.*, 238 Kan. at 93.

The trial court's decisions with respect to liquidated damages and lost profits are reversed and the case is remanded for a new trial on those issues. The trial court's decision on piercing the corporate veil is affirmed.