NASH FINCH COMPANY, Plaintiff,

v.

Leo CASPAR, Defendant.

No. 91–1330–MLB.

United States District Court,
D. Kansas.

Feb. 4, 1993.

Lyndon W. Vix, Mary E. May, Fleeson, Gooing, Coulson & Kitch, Wichita, KS, for Nash Finch Co.

John R. Shirley, Wallace, Brantley & Shirley, Scott City, KS, for Leo Caspar.

## MEMORANDUM AND ORDER

BELOT, District Judge.

This case comes before the court on Nash Finch's motion for summary judgment. (Doc. 33)

Nash Finch is a corporation that sells wholesale food products to retail stores. Caspar owns and operates a grocery store in Scott City, Kansas. He previously operated a Nash-affiliated store in Turon, Kansas, from 1981 until 1985. In 1985, Nash Finch informed Caspar it was in the process of acquiring several grocery stores from Allied Supermarkets, Inc. (Allied). It offered Caspar an opportunity to purchase and/or operate one of the newly acquired stores. Caspar looked at several of the prospective stores, and Nash Finch later advised him the Scott City store was available.

Caspar thereafter met with Nash Finch representatives in Liberal to discuss the Scott City store. Nash Finch showed Caspar the sales history of the store compiled by Allied for the years 1983, 1984, and the first 28 weeks of 1985. At that meeting,

Caspar and Nash Finch entered into an agreement whereby Caspar would operate the Scott City store and lease the building from Nash Finch. Caspar also purchased the store's inventory and equipment from Nash Finch.

Caspar took over the operation of the Scott City store immediately thereafter. After operating the store for less than a month, he received information that the sales performance of the store was less favorable than the report he had received in the Liberal meeting. A few weeks later, Caspar met with a Nash Finch representative to plan a budget for the upcoming year. The parties decided to base their budget on an average weekly sales figure of $45,000. In February, 1986, the parties revised this figure to $39,000.

Caspar operated the grocery store under the lease agreement from 1985 until November, 1989. During this time, Caspar voiced complaints about Nash Finch's prices, products and service. In November, 1989, the parties terminated the lease agreement and in its place executed a contract for deed arrangement whereby Caspar purchased the land and building from Nash Finch. The parties also executed a Retail Sales and Service Agreement (hereinafter "Agreement"), under the terms of which Caspar agreed to purchase inventory from Nash Finch "in an amount not less than 60% of the retail sales volume of the Store's business, with such purchases being made as normally done thru a food wholesaler." The term of the Agreement was to run through March 31, 1995.

Caspar continued to voice complaints with Nash Finch after the Agreement was executed. In April, 1991, he stopped purchasing inventory from Nash Finch and entered into a supply agreement with Affiliated Foods of Norfolk, Nebraska. Caspar did not provide Nash Finch written notice of nonconformity as provided in the Agreement.[1] At the time Caspar discontinued

---

1. The Agreement provided:

   14. *Early Termination.* This Agreement is subject to early termination, but only in part, with respect to particular categories of service(s) of

Product group(s) if Nash–Finch's performance does not conform to the agreed service level. In the event of such nonconformity, Caspar shall give written notice of it to Nash–Finch which shall have sixty (60) days in which to

his inventory purchases from Nash Finch, 203 weeks remained on the Agreement. Nash Finch thereafter commenced this lawsuit. Caspar filed a counterclaim alleging Nash Finch has misrepresented the gross weekly sales of the Scott City store in March, 1985.

## STANDARDS FOR SUMMARY JUDGMENT

Summary judgment is appropriate when the moving party can demonstrate that there is no genuine issue of material fact and is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(c).

## DISCUSSION

■ In this breach of contract action, Nash Finch has the burden to show: (1) execution and existence of a contract; (2) sufficient consideration to support the contract; (3) performance or willingness to perform in compliance with the contract alleged; and (4) Caspar's breach of the contract. *Van Brunt, Executrix v. Jackson*, 212 Kan. 621, 623, 512 P.2d 517 (1973).

Nash Finch argues Caspar has breached the terms of the Agreement by failing to purchase at least 60% of the store's retail sales volume from it. Caspar does not contest this allegation, but contends Nash Finch breached its duty of good faith and fair dealing by failing to be competitive in its pricing. Nash Finch's conduct, according to Caspar, justifies a rescission of the Agreement.

■ To warrant rescission, a breach of contract must be material and the failure to perform so substantial as to defeat the object of the parties in making the agreement in the first place. *Kohn v. Babb*, 204 Kan. 245, 251, 461 P.2d 775 (1969) (quoting

*In re Estate of Johnson*, 202 Kan. 684, Syl. ¶ 3, 452 P.2d 286 (1968)). In support of his contention, Caspar has submitted an affidavit stating that since he discontinued purchasing inventory from Nash Finch, he has been able to realize cost savings on various items in his inventory, as well as on delivery expense. His average weekly gross sales have increased approximately 11% since that time, apparently in response to the more competitive prices Caspar has been able to offer his customers.

■ Caspar's affidavit does not raise any genuine issue of material fact concerning Nash Finch's performance of the Agreement. Under the terms of the Agreement, Nash Finch agreed to sell Caspar inventory "at such prices and upon such terms as may be established from time to time by Nash–Finch for the distribution center, for customers having sales volume similar to that of Caspar." In the court's view, the fact that other suppliers sell certain selected items to Caspar at a cheaper price than Nash Finch charges does not establish that Nash Finch is breaching its contractual obligation of good faith and fair dealing.[2] In the market of food suppliers, there will always be competitors attempting to undercut their rivals' prices. This is the paradigm of free enterprise. Caspar had been doing business with Nash Finch for nearly a decade at the time he entered into the Agreement in 1989. The fact that it later turned out to be less advantageous than he anticipated does not afford him grounds for relief. *See Willman v. Ewen*, 230 Kan. 262, 265–66, 634 P.2d 1061 (1981).

■ The breach of the Agreement having been established, the question then becomes what damages flow from the breach. The general rule in Kansas is that a plaintiff can recover for loss of profits resulting

cure the deficiency. If not cured within the 60 day period, this Agreement with respect to the category of service(s) of Product group(s) specified in the notice shall be terminated, effective seventy (70) days after receipt of the notice by Nash–Finch.

2. Since the Agreement covers a sale of goods [K.S.A. 84–2–105], the Uniform Commercial

Code governs the Agreement. *See* K.S.A. 84–2–102. K.S.A. 84–1–203 imposes an obligation of good faith in the performance of all contracts under the Uniform Commercial Code. As applied to Nash Finch, good faith means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade. K.S.A. 84–2–103.

from a breach of contract when it proves such profits with "reasonable certainty" and shows that "they may reasonably be considered to have been within the contemplation of the parties." *Vickers v. Wichita State University*, 213 Kan. 614, 618, 518 P.2d 512 (1974) (Citations omitted). "Recovery for loss of profits caused by a breach of contract depends upon the facts and circumstances of each particular case." *Id.*

■ Nash Finch seeks damages for Caspar's inventory purchases, membership fees, affiliated buying fee, cash discounts, and inventory overage.[3] Nash Finch has arrived at a damages figure for each category by taking the 1990 figure, dividing by 52 weeks, then multiplying by the 203 weeks left under the Agreement at the time of the breach. Caspar does not dispute either the figures or the methodology used to calculate Nash Finch's damages on any category except for the inventory overage.

Under the category of inventory purchases, Nash Finch has itemized Caspar's 1990 purchases for groceries, frozen foods, milk, dairy, meat, and produce and arrived at figures of $439,645, $71,774, $76,543, $80,954, $213,415 and $81,315, respectively. Nash Finch multiplies each of these respective categories by a different upcharge, and arrived at a gross profit of $39,084.

Under the categories of membership fees and affiliated buying fees, Caspar was required to pay a membership fee of $9.80 a week and an affiliated buying fee of $10.00 per week. Nash Finch's annual income derived from these categories is $509.00 and $520.00, respectively.

Under the category of cash discounts, Nash Finch received an average cash discount of 1.18% from manufacturers and suppliers on groceries and frozen foods and does not pass these discounts on to its customers. Nash Finch has multiplied Caspar's 1990 purchases of groceries and frozen foods by 1.18% and arrived at a figure of $6,035.

Finally, inventory overage is the additional profit Nash Finch makes when, after its purchase of groceries, frozen food, milk and dairy products, these commodities increase in price. These price increases are passed on to Nash Finch's customers. Nash Finch derived an additional profit of 2.37% as a result of market price increases in 1990. Nash Finch has taken that percentage and multiplied it by $796,788, the total amount of Caspar's 1990 purchases subject to inventory overage, and arrived at a damages figure of $18,884.

When these damages figures are added together, Nash Finch's lost annual gross profits are $65,032.

■ Caspar argues the inventory overage figure is improperly included in the damages. His argument is twofold. First, he contends the 2.37% percentage figure is too high because the wholesale price of finished consumer goods has actually declined during the period of the Agreement. Caspar purports to rely on the Bureau of Labor Statistics, Producers Price Index for Finished Consumer Foods for this information. Second, he contends it is impermissible to apply the 2.37% figure prospectively to 1995.

The court believes that neither argument is tenable. First, the government statistics Caspar offers are too broad and too general to be applicable to this case. The statistics encompass goods beyond those that Nash Finch sells to Caspar. The statistics also represent a snapshot of the nation as a whole, rather than the Scott City market in particular. They cannot serve to controvert evidence of specific inventory price increases relative to Caspar.

The second argument fares no better. Caspar contends the 1990 increase of 2.37% could be zero in subsequent years or even a negative figure. However, the inventory overage figure could also exceed 2.37% in subsequent years, in which case Nash Finch's damages would be understated. The court believes that Nash Finch's evi-

---

**3.** Nash Finch initially sought damages for its central billing program, as well as accounting services it provided to Caspar. In its reply brief, Nash Finch abandoned these damage claims. (Doc. 44)

dence of its 1990 profits is relevant to establish future profits.[4] *See Kvassay v. Murray*, 15 Kan.App.2d 426, 434, 808 P.2d 896, *rev. denied*, 248 Kan. 996 (1991). Accordingly, the "evidence" alluded to by Caspar in his two-pronged argument does not raise any genuine issue of material fact pertaining to the inventory overage damage amount.

■ Nash Finch has subtracted from its damages an amount saved as a result of Caspar's breach. These savings include reductions in warehouse payroll and benefits, affiliated field supervision, and in billing clerks and accounting. Nash Finch calculates a reduction in the warehouse payroll and benefits by multiplying the total warehouse sales to Caspar ($1,091,518) by the percentage of warehouse salary costs (2.8%) attributable to the Liberal branch location. The resulting savings is $30,562.

The affiliated field supervision savings are calculated by multiplying the total warehouse sales to Caspar by the percentage (.27%) of total field supervision expenses attributable to the Liberal branch location. The resulting savings is $2,947.

Finally, the annual amount saved on central billing clerks and accounting as a result of no longer doing business with Caspar is $214.

The sum total of money saved as a result of Caspar's breach is $33,723. When the savings are subtracted from Nash Finch's damages figure of $65,032, the resulting figure is $31,309. When this amount is divided into a weekly figure and multiplied out over the term of the Agreement, Nash Finch's damages add up to $122,226.

The court holds that Nash Finch has established that Caspar breached the Agreement and caused Nash Finch damages in the amount of $122,226.

■ Nash Finch also seeks summary judgment on Caspar's counterclaim. Caspar alleges that Nash Finch misrepresented the gross weekly sales of the Scott City store in March, 1985. Nash Finch contends

Caspar's counterclaim is barred by the statute of limitations.

K.S.A. 60–513(a)(3) provides that an action for relief on the ground of fraud shall be brought within two years, but the cause of action does not accrue until the fraud is discovered. Caspar filed his counterclaim well beyond the two year statute of limitation. Caspar contends his counterclaim is not subject to the statute of limitations because of the provisions of K.S.A. 60–213(d), which provides:

> When cross demands have existed between persons under such circumstances that, if one had brought an action against the other, a counterclaim or cross-claim could have been set up, neither can be deprived of the benefit thereof by the assignment or death of the other or by reason of the statute of limitations if arising out of the contract or transaction set forth in the petition as the foundation of plaintiff's claim or connected with the subject of the action; but the two demands must be deemed compensated so far as they equal each other.

■ K.S.A. 60–213(d) does not permit a party to maintain a counterclaim as an affirmative action. *Hatfield v. Burlington Northern R. Co.*, 747 F.Supp. 634, 641 (D.Kan.1990). It does, however, permit a party to assert a time-barred claim as a setoff against the plaintiff's claim if the claim (a) coexisted with the plaintiff's claim and (b) arises out of the "contract or transaction" on which the plaintiff's claim is based. *Lightcap v. Mobil Oil Corporation*, 221 Kan. 448, 464, 562 P.2d 1 (1977).

Caspar's counterclaim clearly did not coexist with Nash Finch's claim. The conduct Caspar complains of in his counterclaim occurred in 1985. The contract upon which Nash Finch seeks to recover damages for its breach was not executed until November, 1989. Thus, Caspar cannot maintain a counterclaim as a setoff to Nash Finch's claim under K.S.A. 60–213(d).

---

4. The court recognizes there may be unique circumstances where it would not be proper to apply such a profit percentage into the future.

No such circumstances are present in the case at bar.

Accordingly, Nash Finch's motion (Doc. 33) for summary judgment is granted.

IT IS SO ORDERED.

