(865 P.2d 1051)
No. 69,799

JETZ SERVICE CO., INC., *Appellee,* v. SALINA PROPERTIES, A
NEBRASKA GENERAL PARTNERSHIP, *Appellant.*

—

Opinion
filed December 23, 1993.

*Michael A. Montoya,* of Achterberg, Neustrom & Montoya, of Salina, for
appellant.

*Arthur E. Palmer,* of Goodell, Stratton, Edmonds & Palmer, of Topeka,
for appellee.

Before BRISCOE, C.J., LARSON, J., and RUSSELL D. CANADAY, District Judge, assigned.

LARSON, J.: Salina Properties appeals the damages awarded to Jetz Service Co., Inc., resulting from breach of the parties' lease of space in which coin-operated laundry equipment was installed in an apartment complex.

Jetz Service supplies and maintains coin-operated laundry equipment in approximately 2,000 locations in an eight-state area. It constantly seeks locations for installation of laundry equipment which is furnished from several warehouses in which an inventory of approximately 1,500 used washers and dryers is always available.

In May of 1987, Salina Properties' predecessor in title leased 175 square feet of an apartment complex to Jetz Service for use as a coin-operated laundry facility. Five washing machines and five dryers were installed in November of 1987.

The lease was for a six-year term. Jetz Service paid an initial $3,000 decorating allowance and was entitled to the first $300 per month or 50%, whichever was greater, of the gross receipts from the machines during the term of the lease. The lease stated the parties assumed the duties of a landlord and tenant under the laws of Kansas.

In July of 1992, with 16 months remaining on the term of the lease, Salina Properties disconnected all of Jetz Service's equipment and replaced it with its own laundry equipment.

Jetz Service retrieved its property at a cost of $187.50 and stored the washers and dryers in one of its warehouses. Four sets of the laundry equipment were re-leased in the Kansas City area in January 1993, although other suitable laundry equipment was available to complete this transaction.

Jetz Service sued Salina Properties to recover its lost profits for the remaining 16 months of the lease. It requested damages equal to one-half of the anticipated gross income for the remainder of the lease. Salina Properties raised numerous defenses but essentially relied on its argument that Jetz Services had failed to mitigate its damages and should only recover the cost of moving its equipment.

The trial court determined Jetz Service was a "lost volume" lessee and had sustained loss of profits and damages in the amount Jetz Service requested. Salina Properties received credit for one month of unpaid rent but Jetz Service was granted judgment for damages of $6,383.08 and $2,165 in attorney fees.

Salina Properties appeals the award of damages. It does not contest the trial court's finding that it was subject to the lease and that its actions in removing Jetz Service's property constituted a breach of the lease agreement.

The two principal contentions Salina Properties raises by this appeal are that Jetz Service (1) failed, as a matter of law, to mitigate its damages and (2) failed to prove the requisite elements to recover lost profits. The underlying issue of most importance, however, is the trial court's finding that Jetz Service should be treated as a "lost volume" lessee and is entitled to recover its expected gross receipts for the remaining term of the lease notwithstanding the fact it utilized part of the laundry equipment before the term of the Salina lease expired.

In deciding this case, we must remain mindful of several basic concepts in the assessment of damages.

"The purpose of awarding damages is to make a party whole by restoring that party to the position he or she was in prior to the [breach]." *Cerretti v. Flint Hills Rural Electric Co-op Ass'n*, 251 Kan. 347, Syl. ¶ 6, 837 P.2d 330 (1992). "[T]he injured party should be placed, so far as can be done by a money award, in the same position that he or she would have occupied if the contract had been performed." *M & W Development, Inc. v. El Paso Water Co.*, 6 Kan. App. 2d 735, Syl. ¶ 4, 634 P.2d 166 (1981).

In *Enlow v. Sears, Roebuck & Co.*, 249 Kan. 732, 738, 822 P.2d 617 (1991), Justice Herd stated: "[B]reach of contract damages 'are limited to those damages which may fairly be considered as arising in the usual course of things, from the breach itself, or as may reasonably be assumed to have been within the contemplation of both parties as the probable result of the breach.' "

Kansas courts have long held that lost profits may be recoverable as damages.

"This court follows the general rule that loss of profits resulting from a breach of contract may be recovered as damages when such profits are

proved with reasonable certainty, and when they may reasonably be considered to have been within the contemplation of the parties. [Citations omitted.] Recovery for loss of profits caused by a breach of contract depends upon the facts and circumstances of each particular case." *Vickers v. Wichita State University*, 213 Kan. 614, 618, 518 P.2d 512 (1974).

The recent case of *Kvassay v. Murray*, 15 Kan. App. 2d 426, 808 P.2d 896, *rev. denied* 248 Kan. 996 (1991), involved the breach of a contract for the sale of goods but considered issues similar to those raised herein and held: "The question of the propriety of liquidated damages is a question of law for the trial court. Thus, the appellate court's scope of review of the trial court's ruling is unlimited." 15 Kan. App. 2d 426, Syl. ¶ 1. "Unquestionably, a method of establishing a loss of profits with reasonable certainty is by showing a history of past profitability." 15 Kan. App. 2d 426, Syl. ¶ 5.

A case dealing with the breach of a farm lease was *Rockey v. Bacon*, 205 Kan. 578, Syl. ¶ 2, 470 P.2d 804 (1970), where it was held: "Loss of profits may be recovered by a tenant upon a wrongful eviction by the lessor."

Our courts further recognize the general rule of law "that one injured by reason of a breach of contract by another is under a duty to exercise reasonable care to avoid loss or to mitigate and minimize the resulting damage. The injured party is bound to protect himself if he can do so with reasonable exertion or at trifling expense, and can recover from the delinquent party only such damages as he could not, with reasonable effort, have avoided." *In re Estate of Stannard*, 179 Kan. 394, Syl. ¶ 1, 295 P.2d 610 (1956).

The standard regarding mitigation of damages is well stated in *Theis v. duPont, Glore Forgan Inc.*, 212 Kan. 301, 307, 510 P.2d 1212 (1973): "The rule . . . is simply that damages are not recoverable for harm that the plaintiff should have foreseen and could have avoided by reasonable effort without undue risk, expense or humiliation." See also *Lindsley v. Forum Restaurants, Inc.*, 3 Kan. App. 2d 489, Syl. ¶ 5, 596 P.2d 1250 (1979) ("The duty to mitigate damages is not an unlimited one and an injured party is required only to exert reasonable efforts to prevent or minimize his damages within the bounds of common sense.").

If we assume a factual finding that Jetz Service made reasonable efforts to reuse the laundry equipment but was unable to do so until January of 1993, the trial court's award of damages for the first six months subsequent to the breach is easily affirmed. We would be required, however, to reduce the award for the damages awarded for the breach of the final 10 months of the lease because 80% (8 of the 10 machines) of the laundry equipment was placed into usage in the Kansas City area lease. We are not willing to reach this result because we agree with the trial court's determination that Jetz Service is a "lost volume" lessee, a concept which has not previously been considered by our Kansas courts.

The term "lost volume" seller is credited to Professor Robert J. Harris of the University of Michigan Law School. See Harris, *A Radical Restatement of the Law of Seller's Damages: Sales Act and Commercial Code Results Compared,* 18 Stan. L. Rev. 66 (1965); *Famous Knitwear Corporation v. Drug Fair, Inc.,* 493 F.2d 251, 254 n.5 (4th Cir. 1974); *Snyder v. Herb Greenbaum & Assoc.,* 38 Md. App. 144, 154 n.3, 380 A.2d 618 (1977).

The "lost volume seller" measure of damages "refers to the lost volume of business the non-breaching seller incurs on buyer's breach. When the seller resells the entity he expected to sell to the original buyer, he usually deprives himself of something of value—the sale to a new buyer of another similar entity." 38 Md. App. at 154 n.3.

The meaning of the term is shown by the following example:

"To illustrate, assume a contract for the sale of a washing machine with a list price of $500. Assume further that the seller has or can obtain more machines than he can sell. The buyer breaches, and the seller resells that washing machine at the same list price the buyer had been willing to pay. However, the resale buyer is one of seller's regular customers who had intended to purchase a washing machine from him anyway. If the seller's total cost per machine was $300, he stood to gain an aggregate profit of $400, that is, $200 profit from each of two sales. Clearly the 2-708 contract-market differential formula is inadequate in this situation since it gives no damages to the seller who has lost a $200 profit because of the breach. In such a case the damage award should be the lost profit, that is, $200, for this will place the seller 'in as good a position as performance would have done.' " 1 White & Summers, Uniform Commercial Code § 7-9, p. 358 (3d ed. 1988).

Salina Properties argues forcefully that the lost volume theory of damage recovery may only be invoked where K.S.A. 84-2-

708(2) of the Uniform Commercial Code applies, which it does *not* in this case because we are dealing with a provider of "services" and not a seller of "goods." K.S.A. 84-2-102. We agree that Jetz Service does not sell goods, but the underlying concept is analogous; adequate authority exists to apply the lost volume rule to volume providers of services.

The application of the lost volume rule is well stated at 22 Am. Jur. 2d, Damages § 509:

"The fact that a reasonably prudent person acting under the facts and circumstances facing the nondefaulting party would have minimized the claimed losses by entering into other contracts with a third party may be shown in reduction of damages. But gains which were or could have been received by the nondefaulting party by entering into another contract or transaction should be used in reducing damages caused by a breach of contract promise only where the breach gave rise to the opportunity to enter into those contracts or transactions. This rule is often applied when damages are sought for breach of an employment contract. A seller can usually resell goods at a profit, retain the profit, and then recover damages from a defaulting buyer, so long as the product was not unique and the seller actually lost a sale. This is the situation of the 'lost volume' seller, in which the second transaction is not a substitute for the lost one. A buyer who claims lost resale profits usually must attempt to 'cover' (obtain substitute goods) in order to mitigate damages, but in the event that the buyer could have resold both the ordered goods and the substitute goods at a profit, it was recognized under pre-UCC law that it may be possible to recover the profit lost on the breached contract. *Similarly, a plaintiff who is in the equipment leasing business is not required to again lease equipment repossessed from a defendant that has breached the lease in preference to leasing out other equipment the plaintiff has in his warehouse, in order to mitigate damages.*" (Emphasis added.)

In Murray on Contracts § 122 D.1 (3d ed. 1990), the applicability of the "lost volume" rule to a provider of services is stated:

"A supplier of services may be able to convince a court that he would have been able to perform a second opportunity that became available after the original contract was breached. Consider, for example, an individual plumber who never subcontracts his work and who has contracted to perform services that will require a full day's effort. If the owner repudiates that contract and the plumber proceeds to work elsewhere on the day scheduled to perform the original contract, must he deduct his earnings from the second job in mitigation of damages recovered from the breached contract? It is certainly possible that the plumber could have performed the second contract as well as the first if he could have delayed the second job. In the

case of enterprises that provide services, courts are inclined to view them as 'lost volume' enterprises, i.e., they are entitled to the profits on both contracts because, presumably, they could have performed both contracts and received both profits absent strong evidence to the contrary. They have even carried this view to the extreme of allowing recovery of both profits where the second performance is identical to the first."

The Restatement (Second) of Contracts § 350, Comment d (1979) has this to say:

" 'Lost volume.' The mere fact that an injured party can make arrangements for the disposition of the goods or services that he was to supply under the contract does not necessarily mean that by doing so he will avoid loss. If he would have entered into both transactions but for the breach, he has 'lost volume' as a result of the breach. See Comment f to § 347. In that case the second transaction is not a 'substitute' for the first one."

Section 347 Comment f of the Restatement (Second) of Contracts (1979) provides:

"Lost volume. Whether a subsequent transaction is a substitute for the broken contract sometimes raises difficult questions of fact. If the injured party could and would have entered into the subsequent contract, even if the contract had not been broken, and could have had the benefit of both, he can be said to have 'lost volume' and the subsequent transaction is not a substitute for the broken contract. The injured party's damages are then based on the net profit that he has lost as a result of the broken contract. Since entrepreneurs try to operate at optimum capacity, however, it is possible that an additional transaction would not have been profitable and that the injured party would not have chosen to expand his business by undertaking it had there been no breach. It is sometimes assumed that he would have done so, but the question is one of fact to be resolved according to the circumstances of each case. See Illustration 16. . . .

Illustration:
16. A contracts to pave B's parking lot for $10,000. B repudiates the contract and A subsequently makes a contract to pave a similar parking lot for $10,000. A's business could have been expanded to do both jobs. Unless it is proved that he would not have undertaken both, A's damages are based on the net profit he would have made on the contract with B, without regards to the subsequent transaction."

We were not furnished nor did our research reveal any Kansas cases directly on point. We therefore turn to several cases from other jurisdictions, the first being startlingly similar factually.

Although not so named, the status of lost volume lessor was found to apply to a plaintiff who was engaged in the business of leasing coin-operated equipment in *Seaboard Music Co. v. Ger-*

*mano,* 24 Cal. App. 3d 618, 101 Cal. Rptr. 255 (1972). Seaboard's lease of a coin-operated juke box and pool table was breached by a tavern operator. The tavern owner claimed that Seaboard was required to mitigate damages by re-leasing the equipment. The California court determined the duty to minimize damages did not apply to contracts " 'which do not preclude plaintiff from undertaking and being engaged in the performance contemporaneously of other contracts.' " 24 Cal. App. 3d at 623.

The court found the evidence showed that Seaboard "was engaged in the business of leasing coin-operated equipment; it had a warehouse full of equipment similar to that leased to Ohmer from which it serviced its customers and from which it could service any additional leases negotiated, irrespective of whether Ohmer fulfilled or breached his obligation." 24 Cal. App. 3d at 623.

The court concluded the duty to mitigate damages could not be imposed to deprive Seaboard of the benefit of subsequent contracts which would had been available to it irrespective of the original breach, and the defendants' liability would not be reduced by requiring Seaboard to forego profits that it would otherwise have made in the normal course of business.

In *Wired Music, Inc. v. Clark,* 26 Ill. App. 2d 413, 168 N.E.2d 736 (1960), the Appellate Court of Illinois determined that when a distributor of music by telephone wires had an unlimited supply of music and was limited in its distribution only by the number of contracts it could secure, the distributor could recover lost profits for the remaining months under a contract from a customer who discontinued service before expiration of the contract period. The fact that the distributor entered into another contract for service at the same location with a new tenant for a higher fee did not relieve the original customer of liability for damages.

The defendant contended Wired Music was under a duty to mitigate damages and since it supplied music to his former location and received greater revenue, Wired Music had not been damaged. The court responded by stating:

"Again, the evidence is uncontradicted that Plaintiff could supply any number of additional customers without incurring further expenses except for wire rental. If Defendant's contention were adopted by this court, it would have the effect of denying to the Plaintiff the benefit of his bargain.

This case is not at all like the situation when a Plaintiff has one house to rent or one car to sell or a fixed quantity of personal property or real estate. Here, Plaintiff has so far as the evidence shows, an unlimited supply of music, limited in its distributions only by the number of contracts which Plaintiff can secure. 'One who has a parcel of real estate cannot multiply it. If he retakes possession he has regained usually the full consideration for which he parted with it. But one who manufactures an article capable of infinite production destroys new outlets with full profits when he reclaims and resells his products.' [Citation omitted.]

"The so-called rule of 'avoidable damages' if applied in this case would serve to deprive the Plaintiff of the true measure of damages." 26 Ill. App. 2d at 416-17.

Here, there was substantial competent evidence to support the trial court's determination that Jetz Service was a "lost volume" lessee. The evidence showed that Jetz Service is in the business of supplying coin-operated laundry equipment; it has several warehouses in which it has available for lease about 1,500 used washers and dryers; it continually looks for new locations in which to install laundry equipment; it would have been able to fulfill the Kansas City lease without using the machines from Salina Properties; and it is uncontroverted Jetz Service would have been able to enter into both transactions irrespective of the breach by Salina Properties.

Under appropriate facts such as exist here, lost volume status should be conferred upon one engaged in a service-oriented business. As a lost volume lessee, Jetz Service was not required to mitigate damages by using the equipment in another lease and Salina Properties is not relieved of the liability to pay damages even though Jetz Service did utilize four of the five sets of laundry equipment six months after Salina Properties' breach.

In *Haag v. Dry Basement, Inc.*, 11 Kan. App. 2d 649, 654, 732 P.2d 392, *rev. denied* 241 Kan. 838 (1987), we stated:

"The determination of the amount of damages is a factual issue, and the trial court's calculation will be upheld if supported by substantial competent evidence. In order for the evidence to be sufficient to warrant a recovery of damages, there must be some reasonable basis for computation which will enable the factfinder to arrive at an approximate estimate thereof."

The calculation of lost future profits was based upon historical past profits generated during the seven month period preceding

Salina Properties' breach. We find the amount claimed was proven with reasonable certainty.

Although the parties did not discuss lost profits when the lease was executed, lost profits are presumed to have been contemplated by the parties. The written agreement shows that the lease payments to Salina Properties were based upon the profits expected to be generated under the lease agreement. In this situation, lost profits would have naturally flowed from a breach of the lease agreement. See Farnsworth, Young & Jones, Cases and Materials on Contracts p. 527 (2d ed. 1972).

Salina Properties claims the trial court erred by failing to reduce the damage award by the direct costs of maintenance and insurance Jetz Service saved by its breach. The record shows these were fixed costs not affected by Salina Properties' breach. Fixed expenses or overhead are the continuous expenses of the business, irrespective of the outlay on a particular contract, and includes such expenses as executive and clerical salaries, property taxes, general administrative expenses, etc. Farnsworth, Young & Jones, pp. 474-75. Fixed expenses or overhead are not deducted when computing lost profits. Farnsworth, Young & Jones, p. 475.

We hold the trial court properly applied the status of lost volume lessee to Jetz Service under the facts of this case. There was substantial competent evidence to justify the trial court's findings and judgment.

Affirmed.