**Samuel E. HERR, an Individual, Plaintiff,**

v.

**McCORMICK GRAIN—THE HEIMAN COMPANY, INC., a Kansas Corporation; and James L. Heiman, an Individual, Defendants.**

**No. 92–1321–PFK.**

United States District Court, D. Kansas.

Dec. 15, 1993.

Opinion Denying Reconsideration Jan. 19, 1994.

---

Robert D. Overman, of Martin, Churchill, Overman, Hill & Cole, Wichita, KS, for plaintiff.

Alan L. Rupe and Edward L. Keely, of Rupe & Girard Law Offices, P.A., Wichita, KS, and Douglas Pfalzgraf, Wellington, KS, for defendants.

## MEMORANDUM AND ORDER

PATRICK F. KELLY, Chief Judge.

Samuel E. Herr filed suit against the defendants, McCormick Grain—The Heiman Company, Inc. (McCormick Grain) and James L. Heiman (Heiman), claiming "unpaid and wrongfully withheld wages" and overtime compensation pursuant to the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 et seq., and the Kansas Wage Payment Act (KWPA), K.S.A. § 44–313 et seq.; seeking recovery of benefits under two McCormick Grain pension plans pursuant to the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 et seq.; and requesting cancellation of three promissory notes the plaintiff executed to McCormick Grain. The defendants filed a counterclaim concerning the promissory notes.

On October 25, 1993, this court denied the defendants' joint motion for partial summary judgment with regard to Herr's ERISA claim. Herr filed a motion for reconsideration on November 4, 1993.

Also pending before this court are McCormick Grain's motion for summary judgment, requesting judgment against Herr based upon the promissory notes counterclaim; Herr's motion for summary judgment with respect to all of his claims but ERISA; and Heiman's motion for summary judgment, in which he argues he is not liable personally because Herr can not pierce the corporate veil.

## I. Motion for Reconsideration

Herr filed a motion for reconsideration, disagreeing with this court's finding that Herr has no vested benefits in the Money Purchase Plan because he was a commission salesman for McCormick Grain. The Money Purchase Plan explicitly excludes commission salesmen. The plaintiff does not argue he was not a commission salesman; rather, he contends that because the Money Purchase Plan does not define "commission salesman," this court should consider extrinsic evidence—"how the employer, the trustee and the plan administrators have interpreted the term 'commission salesman' in the actual operation of the Plan"—in defining the term. (Motion for Reconsideration, at 2.) Herr then maintains "the employer, trustee, and plan administrator did not define grain merchandiser activities to be that of a 'commission salesman' for purposes of the Money Purchase Plan" because McCormick Grain

included defendant Heiman, who also worked as a grain merchandiser, in the Plan. (Motion for Reconsideration, at 3.)

■ Herr accurately states that canons governing contract construction are used in ascertaining the meaning of a pension plan provision. The plaintiff, however, fails to apply those canons correctly.

In *Christie v. K–Mart Corp. Employees Retirement Pension Plan*, 784 F.Supp. 796, 802–03 (D.Kan.1992), Judge Crow reviewed the guidelines for interpreting a provision of an ERISA plan, stating:

> Terms in plans are construed without deferring to either party's interpretation and in accordance with established canons of contract interpretation. With the goal of giving effect to the parties' true intent, a court gives the terms of the Plan the common and ordinary meaning that a reasonable person in the position of an employee would give them. Stated another way, plans are to be construed according to their plain and ordinary meaning in the absence of an ambiguity. . . .
>
> The issue of whether a contract is ambiguous is one of law for the court to decide. An ambiguity exists if a term can be reasonably interpreted in more than one way. The interpretation of an ambiguous term is generally a question of fact decided upon competent evidence concerning the intention of the employer and the beneficiaries, such as past interpretations, past practices, and customary usage.

(Citations omitted.)

Thus, a court only resorts to extrinsic evidence if the term in question is ambiguous. The term "commission salesman" is not ambiguous. There is no ambiguity simply because the Money Purchase Plan does not define "commission salesman"—the term has a plain and ordinary meaning. Nor does Herr suggest the term is susceptible of more than one meaning.

Herr's motion for reconsideration is denied.

## II. *Motions for Summary Judgment*

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue regarding any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must resolve all disputed facts in favor of the nonmoving party. *White v. General Motors Corp., Inc.*, 908 F.2d 669, 670 (10th Cir.1990), *cert. denied*, 498 U.S. 1069, 111 S.Ct. 788, 112 L.Ed.2d 850 (1991). The moving party must prove entitlement to summary judgment beyond a reasonable doubt. *Norton v. Liddel*, 620 F.2d 1375, 1381 (10th Cir.1980).

The moving party is entitled to judgment as a matter of law if the nonmoving party fails to make a sufficient showing of an essential element of the case to which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The existence of some disputed facts automatically does not preclude granting summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). One of the principal purposes of summary judgment is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex*, 477 U.S. at 323–24, 106 S.Ct. at 2553.

### A. *Promissory Notes*

In his amended complaint, Herr requested cancellation of the three promissory notes totaling $31,482.19 that he executed to McCormick Grain. The plaintiff claimed the notes were executed without consideration, under duress, and pursuant to the defendants' misrepresentations. With regard to the promissory notes, the defendants filed a counterclaim, seeking judgment against Herr. In its subsequent motion for partial summary judgment on the counterclaim, McCormick Grain refutes Herr's claims. In Herr's motion for summary judgment, in addition to his other claims, he contends the notes are void as a matter of law because McCormick Grain used the notes to circumvent the KWPA.

In April 1979, Herr entered into an oral contract with McCormick Grain to merchandise grain. Herr was paid an 18% and later a 20% commission. In late 1979 or early 1980, the plaintiff became aware "he was responsible for his pro rata share of losses on grain contracts in which he entered." (McCormick Grain's Motion, Fact No. 5; Pltf.'s Response, at 2.) Prior to executing the promissory notes at issue, Herr experienced losses on grain contracts and reimbursed McCormick Grain for those losses. The timeliness with which Herr reimbursed his pro rata share to McCormick Grain depended upon the amount of money lost on a grain contract—the larger the loss the greater the latitude McCormick Grain gave Herr. Between 1980 and 1991, the plaintiff did not challenge or disavow his "contractual obligation" to reimburse McCormick Grain for his pro rata share of losses. (McCormick Grain's Motion, Fact No. 9; Pltf.'s Response, at 2.)

On March 31, 1990,[1] Herr executed a promissory note to McCormick Grain for 20% of the loss McCormick Grain incurred based upon Follett Feedyard's failure to pay the invoices McCormick Grain had issued. The note was in the amount of $23,703.55 and bore no interest. Because the note remained unpaid in full one year later, Herr was asked to, and on March 31, 1991 did, execute a "renewal promissory note" for the same amount, but bearing 10% annual interest dating back to March 31, 1990. (McCormick Grain's Motion, Fact No. 13; Pltf.'s Response, at 3.)

Herr executed another promissory note on March 31, 1991 to McCormick Grain in the amount of $5,478.64, bearing 10% annual interest. This promissory note represents 20% of McCormick Grain's loss based upon the failure of Wolfe Grain to pay its invoices.[2]

The third promissory note, also issued March 31, 1991, was in the amount of $2,300.00, bearing 10% annual interest. This note represents Herr's failure to repay a commission advance.

In his deposition testimony, Herr acknowledged he was aware the defendants expected him to pay off the notes. Herr added that he was told he had to sign the promissory notes, but that the company would work with him on a repayment schedule. No specifics were discussed. Herr's only complaint to the defendants at the time of executing the promissory notes was that he did not believe he was liable until pending bankruptcy litigation involving Follett Feedyard and Wolfe Grain was settled.

At the time Herr terminated his employment with McCormick Grain, Heiman asked Herr about repayment of the promissory notes. Herr responded, "I imagine that you'll do like you always have done and keep any commissions due me, and if you want to come after me, I guess come after me." (Defs.' Response, Ex. A, at 137; see McCormick Grain's Motion, Fact No. 20; Pltf.'s Response, at 4.) The plaintiff added he might have to file bankruptcy if Heiman came after him. Prior to leaving McCormick Grain, Herr never suggested to his employer that he signed the promissory notes because of duress or misrepresentation.

 In its motion for partial summary judgment, McCormick Grain advances two premises to support its claim that the promissory notes[3] were supported by consider-

---

1. McCormick Grain's fiscal year ends on March 31 of each year. (McCormick Grain's Motion, Fact No. 26; Pltf.'s Response, at 4.)

2. In its response to Herr's motion for summary judgment, McCormick Grain recognizes "two credits due [Herr] on the Wolfe [Grain] loss in the sums of $1,293.94 and $435.92 were inadvertently by error of counsel not given to [Herr], changing the sum due on the Wolfe [Grain] note only from the principal sum of $3,935.15 to $2,229.89." (Defs.' Response, at 49–50.)

Herr voluntarily entered into the grain contracts with Follett Feedyard and Wolfe Grain.

After Heiman cautioned Herr about entering into future transactions with Follett Feedyard, further grain shipments were sent to Follett Feedyard. These shipments, however, were sent contrary to Herr's directions to the elevator supplying the grain and were part of the original contract, not new transactions.

3. McCormick Grain contends the notes are negotiable instruments as defined in K.S.A. 84–3–104 (1992 Supp.), containing Herr's unconditional promise to pay upon demand, pursuant to K.S.A. 84–3–108 (1992 Supp.), the amounts listed in the notes to McCormick Grain. The defendant does not expound upon this contention.

ation. The defendant's first premise is that Herr's repayment obligation, as evidenced by the promissory notes, was part and parcel of the employment contract and, therefore, new consideration for the promissory notes was not needed. According to the defendant, the original contract was supported by consideration—Herr received "a legally recognized benefit" by virtue of the fact McCormick Grain fulfilled its contractual obligation to pay Herr commissions. (McCormick Grain's Motion, at 12.) McCormick Grain relies upon the emphasized portion of the following American Jurisprudence discussion:

> Where a contract does not contemplate the making of a subsequent agreement, the original consideration will not support such subsequent agreement. Hence, a subsequent agreement not forming any part of an original contract and not supported by the original consideration thereof or by any new consideration is void. *But an agreement made pursuant to a previous contract which was supported by a consideration may be considered a part of that contract and therefore based upon a sufficient consideration. In other words, where a contract contemplates the subsequent execution of a subsidiary agreement, the promises in such agreement are supported by the consideration of the original contract.*

17A Am.Jur.2d *Contracts* § 163, at 178–79 (1991) (emphasis added). McCormick Grain also directs this court's attention to *Hurless v. Wiley*, 91 Kan. 347, 137 P. 981 (1914), one of the cases American Jurisprudence cites in support of the emphasized portion of the quote.

In *Hurless,* the parties entered into a written contract in which Wiley agreed to sell, and Hurless agreed to buy, a parcel of land at $25.00 per acre. Hurless paid the purchase price, and a deed conveying the land from a third party to Hurless was delivered. One week later, "Wiley signed and delivered to Hurless an agreement to find a purchaser for the land at $30 an acre within the ensuing year." 91 Kan. at 347–48, 137 P.2d 981.

Wiley failed to find a buyer, and Hurless sued for breach of contract and won. The judgment of the trial court established "that at the time the first written contract was made [Wiley] agreed to find a buyer at $30 an acre within the year, this agreement being a part of the inducement for the purchase, and that the subsequent writing was given in pursuance of this promise." *Id.* at 348, 137 P. 981.

On appeal, Wiley argued that the second contract was void for lack of consideration and that parol evidence should not be allowed to vary the terms of the first written contract. The Kansas Supreme Court rejected both arguments, holding that parol evidence was competent to show consideration for a written contract made after the original contract. The court stated: "Oral evidence was necessary, not to prove the promise, but to show for what it was given." *Id.* at 349, 137 P. 981.

Herr interprets *Hurless* and the general rule discussed in American Jurisprudence to mean that in order for there to be sufficient consideration, the two contracts must be connected directly, part of the same transaction, and related closely in time. Herr then focuses upon the instant facts, claiming there was no discussion concerning his responsibility for losses when he initially entered into an employment contract with McCormick Grain. The plaintiff maintains there is no evidence that he "agreed as part of the same transaction" to execute promissory notes to McCormick Grain for losses incurred or that McCormick Grain was induced to hire him because of such an agreement. (Pltf.'s Response, at 16.) Herr also claims the first time McCormick Grain presented him with promissory notes for such losses was in 1990, more than 10 years after the original employment contract.[4]

McCormick Grain suggests it is irrelevant whether Herr knew losses would be deducted from his commissions when he began working for the company in April 1979 because

---

4. The defendants include in their response exhibits to Herr's motion for summary judgment, copies of promissory notes Herr signed that are dated September 11, 1987, March 24, 1988, and December 30, 1988. Only the December 30 note references the basis for the note, and that note was issued in conjunction with a loan to buy cattle. (Defs.' Response, Exs. E, F & G.)

Herr has acknowledged he was aware of such in late 1979 or early 1980. In the defendant's view, the employment contract began in late 1979 or early 1980 and was either an amendment to the original contract or a new oral contract. McCormick Grain maintains the terms of this contract were upheld and applied numerous times during Herr's 12 years as McCormick Grain's employee, and the fact that promissory notes were not used on prior occasions was "happenstance". (McCormick Grain's Reply, at 3.) According to the defendant's interpretation, neither the *Hurless* decision nor the American Jurisprudence discussion limits the time between execution of the first and subsequent contracts. Rather, according to the defendant, what these authorities dictate is that the original contract needs to contemplate the subsequent contract.

McCormick Grain, however, offers no evidence to establish the April 1979 employment contract contemplated the late 1979/early 1980 employment contract. The defendant offers no evidence that Herr's repayment obligation was an amendment to the original contract or was a new oral contract. Additionally, the value of the *Hurless* decision to the instant facts is questionable because the focus of *Hurless* was upon the propriety of using parol evidence. *See Hickman v. Richardson,* 92 Kan. 716, 720, 142 P. 964 (1914).

*Puritan–Bennett Corp. v. Richter,* 8 Kan. App.2d 311, 657 P.2d 589 (1983), offers guidance. The Puritan–Bennett Corporation (PBC) orally offered employment to Robert Richter, which he accepted in writing. When Richter reported to work six weeks later, in the process of completing the requisite employment and insurance forms, personnel informed the defendant he had to sign a "Hiring Agreement" as a condition of employment. Among other things, the agreement restricted Richter from working for any of PBC's competitors for one year after leaving PBC. Management previously had not informed Richter of this condition. After seven successful years with PBC, during which time he received various promotions, Richter resigned and notified PBC he had accepted a position with one of PBC's competitors. PBC sued Richter, seeking injunctive relief

and enforcement of the restrictive covenants in the hiring agreement.

One of Richter's defenses was that the hiring agreement was unenforceable for lack of consideration. The trial court found "there was no consideration supporting the enforceability of the hiring agreement, reasoning that the consideration for the original employment contract was independent of the 'Hiring Agreement' while Richter's continued employment following execution of the agreement was insufficient to support the agreement." 8 Kan.App.2d at 313, 657 P.2d 589. The Kansas Court of Appeals concluded:

There was ample evidence to support the trial court's conclusion that Richter and [PBC] did not agree to the covenant not to compete as part of the original contract of employment. Richter's job had been offered and accepted in writing six weeks before he ever saw or knew about the covenant not to compete. The salary was agreed to and the company paid the Richters' expenses for a house-hunting trip to the area. In reliance on the contract, Richter sold his house in Wisconsin, moved his family to Kansas City, bought a new house and enrolled his son in school. Only after reporting for work was he asked to sign the covenant not to compete. The written hiring agreement provided no new benefits to Richter other than those accruing to all employees and thus did not supplement or define the original agreement. Finally, the hiring agreement cannot be viewed as the completion of an incomplete contract since there was no evidence the contract was incomplete or that the parties left terms open for later resolution. In sum, there was abundant support for the trial court's view of the hiring agreement as separate and independent of the original contract of employment. Thus, the consideration needed to support the enforceability of the agreement containing the covenant of nondisclosure and noncompetition would have to consist of some burden or benefit outside the original contract to hire.

*Id.* at 313–14, 657 P.2d 589. The court of appeals rejected the trial court's finding that the defendant's continued employment was

not sufficient consideration to support the hiring agreement, holding:

> [C]ontinued employment should not as a matter of law be disregarded as consideration sufficient to uphold a covenant not to compete. Ordinarily, the presence of a benefit or detriment to a promisor, sufficient to constitute consideration, is a question of fact, as is the question of what constitutes consideration when that issue is controverted.

*Id.* at 315, 657 P.2d 589 (citation omitted). According to the court of appeals, the trial court erred in not enforcing the agreement because the uncontroverted facts showed the defendant received a benefit—Richter "was given consistent promotions, increased responsibilities and greater importance in company operations after signing the covenant not to compete." *Id.*

Here, as in *Puritan–Bennett Corp. v. Richter*, there is no evidence Herr received additional benefits at the time he was informed of his repayment obligation. There also is no evidence that the original April 1979 employment contract was incomplete or that McCormick Grain and Herr left terms open for later resolution. In contrast to *Richter*, there is no evidence Herr was given consistent promotions, increased responsibilities, or greater importance in company operations.

█ McCormick Grain's second premise in support of its claim the promissory notes were supported by consideration is its forbearance at the time of executing the notes. McCormick Grain maintains it could have exercised its contractual right, pursuant to the late 1979/early 1980 employment contract, to deduct from Herr's subsequent commission checks the losses at issue here (as it had done with past losses) rather than allowing Herr to execute promissory notes. In support, the defendant cites 17A Am.Jur.2d *Contracts* § 156, at 172–73 (1991) ("[A] request to forbear, forbearance to sue on an enforceable claim, or an extension of the time for the payment thereof, is a sufficient consideration for a promise."), and *Reed v. Hess,* 239 Kan. 46, Syl. ¶ 2, 716 P.2d 555 (1986) ("Forbearance to sue can be good consideration for a promise, regardless of the actual validity of the claim, if the one who forbears has a reasonable and sincere belief in its validity.").

Herr contends McCormick Grain's forbearance argument is flawed because the defendant could forbear only if a loss had occurred prior to executing the promissory notes and a loss has not occurred at the time the notes were executed. According to the plaintiff, McCormick Grain's unilateral categorization of the outstanding Follett Feedyard and Wolfe Grain invoices as losses was in error because the bankruptcy actions for Follett Feedyard and Wolfe Grain were pending.

McCormick Grain replies that Herr has confused " 'recovery' with an 'unliquidated debt.' " (McCormick Grain's Reply, at 3.) The defendant asserts that if Herr's theory is "advanced to its logical conclusion ... every note arising from a loss created by a third party would forever be an 'unincurred loss' ... as payment or partial payment could always occur." (McCormick Grain's Reply, at 4.) McCormick Grain adds there is nothing unliquidated about the note representing a commission advance to Herr.

McCormick Grain acknowledges its evidentiary burden as the movant for summary judgment, but declares the existence of the written promissory notes creates a rebuttable statutory presumption against Herr. *See* K.S.A. § 16–107 ("All contracts in writing, signed by the party bound thereby, or his authorized agent or attorney, shall import a consideration."); K.S.A. § 16–108 ("The want or failure in the whole or in part, of the consideration of a written contract, may be shown as a defense, total or partial, as the case may be, in an action on such contract, brought by one who is not an innocent holder in good faith."); *see also State ex rel. Ludwick v. Bryant,* 237 Kan. 47, 50, 697 P.2d 858 (1985) (import, as used in K.S.A. § 16–107, does not mean "absolutely exists"). McCormick Grain appears to be arguing that the statutory presumption for consideration transfers the evidentiary burden to Herr and that this court must grant its motion for summary judgment unless Herr establishes, by substantial competent evidence, a lack of consideration. The defendant's argument is not persuasive.

In discussing the 1963 equivalents of K.S.A. §§ 16–107 and –108, which are essentially the same as the current versions, the Kansas Supreme Court has explained:

> The presumption of consideration is not a presumption of law; it is a presumption of fact. It extends to any fact which under the situation and circumstances of the parties might reasonably supply a consideration, and it cannot be overthrown except by proof of facts warranting the inference of no consideration of any kind. It is always an affirmative defense, and may not be inferred or presumed.
>
> In *National Bank v. Williams*, 117 Kan. 501, 503, 232 Pac. 252 we held that a failure of consideration is a defense to a promissory note when the suit is by the payee against the maker, and this may be shown by parol evidence and is naturally a jury question. Ordinarily the question of the presence of a benefit or detriment to the promisor, sufficient to constitute a consideration, is a question of fact, as is the question of what constitutes the consideration, where it is controverted. Where consideration for a contract is controverted, the conflict between testimony of want of consideration and a statutory presumption of valuable consideration is sufficient to require a submission of the question of consideration to the jury.

*Ferraro v. Fink*, 191 Kan. 53, 56–57, 379 P.2d 266 (1963) (citations omitted); *see Bryant*, 237 Kan. 47, Syl. ¶ 2, 697 P.2d 858 ("If a contract is written, the existence of consideration is presumed unless the lack of consideration is raised as an affirmative defense and is proved by substantial competent evidence.").

With regard to the two promissory notes based upon the Follett Feedyard and Wolfe Grain accounts, there is little evidence to support either party's position concerning whether sufficient consideration supported the agreement that Herr would reimburse the defendant for his pro rata share of losses. What evidence has been presented is controverted. Thus, this court denies the parties' motions for summary judgment concerning the two promissory notes based upon losses incurred as a result of contracts involving

Follett Feedyard and Wolfe Grain. It is not necessary to address the remaining arguments concerning these two notes.

Concerning the third promissory note, there is no significant consideration question because there can be little doubt Herr received a benefit. Herr requested and received the monetary advance.

■ With regard to the duress argument, McCormick Grain maintains *Hastain v. Greenbaum*, 205 Kan. 475, 470 P.2d 741 (1970), and the instant facts do not support Herr's claim of economic duress. In *Hastain*, the plaintiff brought suit to recover on a promissory note. The defendants acknowledged executing the note, but alleged the note was executed under duress. The trial court entered summary judgment for the plaintiff, finding insufficient evidence to support the allegation of duress. The Kansas Supreme Court affirmed, discussing the duress defense at length. The court held that "[w]hether facts offered in a particular case are sufficient to constitute duress is a question of law" and that "[t]o constitute duress there must be a wrongful act or wrongful threat which compels apparent assent by another to a transaction without his volition." 205 Kan. 475, Syl. ¶¶ 4–5, 470 P.2d 741.

> "To establish duress as ground for the avoidance of a contract, . . . it is not alone sufficient to show the exertion of pressure by threats or even by physical compulsion, but it must also clearly appear that the force or threats employed actually subjugated the mind and will of the person against whom they were directed, and were thus the sole and efficient cause of the action which he took."

*Id.* at 484, 470 P.2d 741 (quoting 1 Black on Rescission and Cancellation, 2d ed., § 223.) Furthermore, " 'evidence to establish duress must be substantial—not merely some evidence—and the court is not obligated to submit to the jury evidence which does not measure up to the required standard of proof.' " *Id.* at 482, 470 P.2d 741 (quoting *Western Paving Co. v. Sifers*, 126 Kan. 460, 268 P. 803 (1928)). And further:

> " 'It would not be proper to simply hold that, merely because a person who has

made a contract declares under oath that he was intimidated and acting under fear and duress when the contract was made by him, the contract should by reason of his mere statement be avoided. If that rule were adopted most contracts would be avoided.' "

*Id.* (citation omitted).

In response, Herr claims he did not sign the three promissory notes of his own free will because his commissions were his family's only source of income and he believed failure to sign the notes would result in his commissions being withheld (for several months, taking into account his rate of earning and the amount McCormick Grain claimed he owed) or his job being terminated. In addition to his own deposition testimony, the plaintiff refers this court to the sworn statements of other grain merchandisers who shared his belief. Herr fails to meet the requisite standard of proof concerning the promissory note based upon McCormick Grain's commission advance to him.

 Herr rests his misrepresentation claim upon McCormick Grain's demand that the promissory notes be executed by a certain date so that the end-of-the-fiscal-year auditing process could proceed on schedule. The plaintiff alleges he and other grain merchandisers were told that executing the notes "was a mere formality and that they would work out the real transaction later." (Pltf.'s Memo., at 54.) The plaintiff's references to the record do not support this allegation. In his deposition testimony, Herr acknowledged he knew McCormick Grain expected him to pay off the notes. McCormick Grain declares the fact it demanded execution of the promissory notes in conjunction with the end of the company's fiscal year was not a misrepresentation. This court agrees.

 Herr's initial claim that McCormick Grain used the notes to circumvent the KWPA concerns the two promissory notes based upon losses McCormick Grain incurred as a result of the Follett Feedyard and Wolfe Grain contracts. After the defendant argues the note based upon the advance should be treated separately, Herr maintains this note is in actuality no different than the other notes—McCormick Grain decided to treat the loss as an advance, even though the loss arose out of circumstances similar to the other two notes. When the plaintiff was deposed, however, he admitted the $2,300.00 promissory note was "an advance towards commissions." (Defs.' Response, Ex. A, at 129.) The third promissory note based upon Herr's failure to repay a commission advance will be treated separately.

The plaintiff argues all three notes violate K.S.A. § 44–319(a), which provides:

No employer may withhold, deduct or divert any portion of an employee's wages unless: (1) The employer is required or empowered to do so by state or federal law; (2) the deductions are for medical, surgical or hospital care or service, without financial benefit to the employer, and are openly, clearly, and in due course recorded in the employer's books; or (3) the employer has a signed authorization by the employee for deductions for a lawful purpose accruing to the benefit of the employee.

Herr compares the notes in this case to deductions specifically identified as not accruing to the employee's benefit in K.A.R. § 49–20–1(a)(2)(A), which prohibits "[d]eductions made for cash and inventory shortages; breakage; returned checks or bad credit card sales; losses to employers resulting from burglaries, robberies, or alleged negligent acts."

With regard to the third promissory note, Herr's argument is flawed. A note for repayment of a commission advance is not a withholding, deduction, or diversion of the employee's wages. The KWPA does not apply to the third note.

Granting summary judgment in favor of McCormick Grain on the third promissory note, which is based upon the commission advance, is warranted.

### B. *Fair Labor Standards Act*

Under the FLSA, an employer must pay overtime compensation to employees who work more than 40 hours per week. 29 U.S.C. § 207(a)(1) (1993 Supp.). In his motion for summary judgment, Herr argues he

was McCormick Grain's employee for purposes of the FLSA; he was not a statutorily exempt employee; he worked more than 40 hours in an average week but was not paid overtime compensation; and he was paid at a rate less than minimum wage. Herr also contends the applicable statute of limitations is three years. In response, the defendants assert Herr was not an employee pursuant to the FLSA, but even if he was, he was an administrative employee and therefore not eligible for FLSA coverage. The defendants also dispute that Herr worked more than 40 hours per week and that he was paid less than minimum wage. According to the defendants, the applicable statute of limitations is two years.

■ The FLSA defines employee as "any individual employed by an employer"[5], and employ as "to suffer or permit to work." 29 U.S.C. § 203(e)(1), (g). Based upon the latter definition, the United States Supreme Court has construed employee under the FLSA more expansively than under ERISA. *See, e.g., Nationwide Mut. Ins. Co. v. Darden*, —— U.S. ——, ——, 112 S.Ct. 1344, 1350, 117 L.Ed.2d 581, 117 L.Ed.2d 581, 591 (1992) (FLSA's definition of employee is of "striking breadth ... and stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles."). Thus, if Herr was an employee under ERISA, which this court found in its memorandum and order filed October 25, 1993, then Herr must be an employee under the FLSA.

■ The next question is whether Herr was an administrative employee. Administrative employees are exempted from FLSA coverage. 29 U.S.C. § 213(a)(1) (1993 Supp.). The statute does not define administrative employees; however, the Code of Federal Regulations establishes a short and a long test to ascertain if an employee is employed in an administrative capacity. As the Tenth Circuit Court of Appeals has explained, "[e]mployees earning less than $250 per week are subject to the 'long test' of 29 C.F.R. §§ 541.2(a)–(e) [1993], whereas those

earning $250 or more per week are governed by the 'short test' as set forth in the proviso to § 541.2(e)(2)." *Donovan v. United Video, Inc.*, 725 F.2d 577, 580 (10th Cir.1984). The defendants contend the short test applies. Herr apparently agrees, although he maintains he did not earn $250.00 per week *every week* because there were six bimonthly periods for which he was paid no commission. If Herr's annual compensation is divided by 52 weeks for the years 1980 through 1991, the plaintiff never earned less than $250.00 per week.

■ Under the short test, (1) the employee's primary duty consists of performing "office or nonmanual work directly related to management policies or general business operations of [the] employer or [the] employer's customers" and (2) the employee's work requires exercising discretion and independent judgment. 29 C.F.R. § 541.2(a)(1), (e)(2) (1993); *see Donovan*, 725 F.2d at 580–81; *Hills v. Western Paper Co.*, 825 F.Supp. 936, 937 (D.Kan.1993). "The employer who asserts the exemption has the burden of establishing both of these requirements by clear and convincing evidence." *Donovan*, 725 F.2d at 581 (citations omitted). An exemption shall be construed narrowly against the employer asserting it. *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392, 80 S.Ct. 453, 456, 4 L.Ed.2d 393 (1960).

At issue here is whether Herr exercised discretion and independent judgment. The Code of Federal Regulations provides:

(a) In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered. The term ... implies that the person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance....

(b) The term must be applied in the light of all the facts involved in the particular employment situation in which the question arises. It has been most frequently misunderstood and misapplied by

---

**5.** This is the same definition found in ERISA. See 29 U.S.C. § 1002(6).

employers and employees in cases involving the following: (1) Confusion between the exercise of discretion and independent judgment, and the use of skill in applying techniques, procedures, or specific standards; . . .

(c) Distinguished from skills and procedures:

(1) Perhaps the most frequent cause of misapplication of the term "discretion and independent judgment" is the failure to distinguish it from the use of skill in various respects. An employee who merely applies his knowledge in following prescribed procedures or determining which procedure to follow, or who determines whether specified standards are met or whether an object falls into one or another of a number of definite grades, classes, or other categories, with or without the use of testing or measuring devices, is not exercising discretion and independent judgment within the meaning of § 541.2. This is true even if there is some leeway in reaching a conclusion, as when an acceptable standard includes a range or a tolerance above or below a specific standard.

29 C.F.R. § 541.207 (1993). Several examples are given, although none are quite on point.[6] *See* 29 C.F.R. § 541.207(c)(2)–(7) (1993).

Herr claims he was not "free" to exercise discretion and independent judgment. (Pltf.'s Memo., at 38.) In support of this claim, the plaintiff relies upon the fact that at least one McCormick Grain officer was present in the trading room while he executed his grain merchandising duties and that McCormick Grain monitored, directed, and supervised his job performance. For example, McCormick Grain assigned customers and suppliers to each grain merchandiser based upon the merchandiser's job performance. Herr asserts he did not exercise any true discretion or independent judgment because every buy or sale he made had to be within the guidelines McCormick Grain had established. For example, McCormick Grain controlled the allowable range of profit margin and the terms of any contract to buy or sell grain.

The defendants' response is two-fold. They maintain they set forth in their responsive memorandum the facts establishing the administrative exemption. The defendants, however, fail to specify to which facts they are referring. The defendants' statement of additional facts does not provide enlightenment.

Additionally, the defendants point out the Department of Labor (DOL) found Herr to be an exempt employee. The DOL's two-page narrative report of investigation provided:

Merchandisers are responsible for buying/selling grain. They have established accounts and are always researching to obtain new accounts. They are buying grain at a negotiated price, and in this negotiation comes the gain/loss of commission. All "deals" must be approved by one of the Heimans, but if a financial loss is incurred, it comes directly out of the merchandiser's commission for the month. There is a great deal of discretion and independent judgment in such deals.

The functional purpose of this business is buying and selling grain, and this is the function of the merchandisers. However, these merchandisers have been considered by this [company] to be 541.2 exempt. The industry practice (stockbrokers, ac-

---

**6.** The most pertinent example follows:

A typical example of the application of skills and procedures is ordinary inspection work of various kinds. Inspectors normally perform specialized work along standardized lines involving well-established techniques and procedures which may have been cataloged and described in manuals or other sources. Such inspectors rely on techniques and skills acquired by special training or experience. They may have some leeway in the performance of their work but only within closely prescribed limits. Employees of this type may make recommendations on the basis of the information they develop in the course of their inspections . . ., but these recommendations are based on the development of the facts as to whether there is conformity with the prescribed standards. In such cases a decision to depart from the prescribed standards or the permitted tolerance is typically made by the inspector's superior. The inspector is engaged in exercising skill rather than discretion and independent judgment. . . .

29 C.F.R. § 541.207(c)(2) (1993).

count [executives] managing investments) is that these type of individuals are classified as 541.2 exempt.... Based on the high income of each of the merchandisers ... they are still considered 541.2 even though they are not paid a set salary. With the average of 50,000 per year salary, the merchandisers would earn the equivalent of at least 250/week in all workweeks. (Defs.' Response, Ex. L, at p. 1 of FLSA Narrative.) According to the report, at a final conference held between the DOL representative and the defendants, the DOL representative discussed 541 provisions, "including minimum salary guarantee, and DOL position not to pursue [overtime] compensation for [employees] who would be 541 except for the lack of a guaranteed salary (when the salary is quite high)" as well as the employees' right to pursue these claims through litigation. (*Id.*, at p. 2 of FLSA Narrative.)

This case does not involve an appeal from an administrative decision, in which context courts give "great deference" to the administrative agency's factual findings. *See, e.g., Action, Inc. v. Donovan,* 789 F.2d 1453, 1457, 1459 (10th Cir.1986). The defendants fail to cite any authority concerning the weight this court should give the DOL finding in the context of this case. The DOL finding will be given the same weight as other evidence presented to the court.

A factual dispute exists concerning whether Herr exercised sufficient discretion and independent judgment for him to be classified as an administrative employee. Summary judgment on the FLSA issue is inappropriate. Consequently, it is not necessary to address the parties' other contentions regarding the FLSA claim.

C. *Kansas Wage Payment Act*

In his motion for summary judgment, Herr also argues the KWPA governs McCormick Grain's actions because the company paid him a commission for services he rendered on behalf of the company. *See* K.S.A. § 44–313(a) (KWPA defines employer as "any corporation ... employing any person"); K.S.A. § 44–313(b) (KWPA defines employee as "any person allowed or permitted to work by an employer"); K.S.A. § 44–313(c) (KWPA defines wages as "compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission or other basis less authorized withholding and deductions").

The defendants argue McCormick Grain's actions do not fall within the purview of the KWPA because Herr was not an employee, but an independent contractor, under the right to control test set forth in *Crawford v. Kansas Dep't of Human Resources,* 17 Kan. App.2d 707, 709–10, 845 P.2d 703 (1989). *Crawford* involved an appeal from the trial court's affirmance of the finding of the Kansas Department of Human Resources (KDHR) that the appellant's business, which supplied demonstrators to stores to promote food or explain how appliances or products worked, "was subject to state unemployment tax because the people who worked as demonstrators were employees and not independent contractors." *Id.* at 708, 845 P.2d 703. In deciding whether the trial court erred in ruling the demonstrators were employees, the Kansas Court of Appeals discussed the determining factors:

There is no absolute rule for determining whether an individual is an independent contractor or an employee. The facts and circumstances in each case determine the status of the individual.

An independent contractor is generally described as one who contracts to do certain work according to his own methods and is not subject to the control of his employer except as to the results or product of his work.

An employer's right to direct and control the method and manner of doing the work is the most significant aspect of the employer-employee relationship, although it is not the only factor entitled to consideration. An employer's right to discharge the worker, payment by the hour rather than by the job, and the furnishing of equipment by the employer are also indicia of an employer-employee relationship.

It is the right of the employer to control the manner of the work that is significant, not the actual interference or exercise of control by the employer.

*Id.* at 709–10, 845 P.2d 703 (citations omitted). The court of appeals then set forth the 20 factors the KDHR considered in deciding if an employer/employee relationship exists.[7]

The defendants also direct this court's attention to two letters from Kele Wichman, a labor conciliator for the KDHR, which has statutory authority to enforce the KWPA. *See* K.S.A. § 44–322, and § 44–322a (1992 Supp.). According to the defendants, the KDHR found Herr was not an employee.

> Wichman's letter of April 22, 1992, stated: We are returning your claim form for several reasons. The main reason, however, is because we do not feel you are considered an "employee". Our office handles claims where there has been an employer/employee relationship. We do note your feelings that you were, in fact, an employee[;] however, we do not make that determination.

(Defs.' Response, Ex. A, Depo. Ex. 5.) In her letter of September 24, 1992, Wichman stated: "Enclosed please find Employer's Answer received in response to the claim you have filed. Based on a review of the enclosed information, we are once again of the opinion that you are not considered an employee as a 'merchandiser'." (Defs.' Response, Ex. A, Depo. Ex. 6.)

Herr replies that the KDHR never officially opined, found, or determined his status. In support, the plaintiff relies upon the deposition of Kele Wichman, who testified she did not determine or opine whether an individual qualified as an employee. Wichman stated her letters were merely informational. She also explained her decision to write the April 22 letter and return Herr's claim was based solely on McCormick Grain giving Herr a Form 1099 instead of a W–2 Form and on McCormick Grain not compensating Herr for

vacation pay or including him in its profit-sharing plans. Wichman added that the KDHR would return any claim from an individual whose employer gave him or her Forms 1099. A letter, dated October 26, 1992, from a senior labor conciliator confirms the KDHR never issued an official opinion on whether Herr was an employee or independent contractor.

There is no genuine issue regarding any material fact. This court has determined Herr was McCormick Grain's employee in the context of ERISA and FLSA. The *Crawford* factors, assuming these factors are the appropriate test for determining if an employer/employee relationship exists in the context of the KWPA, are similar to the factors previously examined. For purposes of the KWPA, this court finds Herr was McCormick Grain's employee.

The plaintiff charges McCormick Grain with violating the KWPA by failing to pay him for commissions he earned during his employment. *See* K.S.A. § 44–315(a) ("Whenever ... an employee quits or resigns, the employer shall pay the employee's earned wages not later than the next regular payday...."); K.S.A. § 44–315(b) (An employer's knowing failure to pay such wages makes the employer liable not only for the unpaid wages, but for damages of one percent per day, up to the amount of the wages.) According to Herr, McCormick Grain reported on its Form 1099 for the year 1991 $1,874.42 in commissions, which were computed after he left McCormick Grain and for which he never received payment.[8] He contends McCormick Grain also owes him for commissions computed during the 1992 calendar year.[9]

The defendants do not respond directly to the plaintiff's charge. In the context of the

---

7. These factors are similar to the common-law factors this court addressed in the ERISA context. *See Herr v. McCormick Grain*, No. 92–1321, at 13, 1993 WL 444304 (D.Kan. Oct. 25, 1993).

8. The 1991 Form 1099 for Herr and McCormick Grain's 1991 breakdown summary of Herr's grain trading activity both list Herr's gross annual income as $51,192.37. (Pltf.'s Memo, Ex. 23 at 12, & Ex. 29.) Herr terminated his employment on December 3, 1991. The breakdown

summary sheet reflects Herr earned a gross sale of $1,874.42 for the period ending December 15, 1991. (Pltf.'s Memo, Ex. 29.)

9. Herr does not cite to the record to support this statement. Evidently, Form 1099 for 1992 or McCormick Grain's 1992 breakdown summary sheets reflecting sales credited to Herr have not been included in the exhibits. The defendants, however, do not dispute Herr's statement.

withholding argument, the defendants contend that Herr was aware "future commissions would be applied against the promissory notes" and that $3,705.44 in commissions was applied against the Wolfe Grain note. (Defs.' Response, at 49.)

With regard to Herr's awareness, the defendants interpret the facts loosely. The defendants' support for their contention is Herr's deposition, specifically, his testimony that in discussing the promissory notes, he told Heiman, "I imagine that you'll do like you always have done and keep any commissions due me. . . ." (Defs.' Response, Ex. A, at 137.) Nonetheless, because of the factual dispute, which is material, summary judgment is inappropriate.

Herr next alleges McCormick Grain violated the KWPA by withholding $1,634.53 as interest on accounts receivable and $20,237.37 from his commissions for repayment of promissory notes and advances.[10] The plaintiff maintains McCormick Grain's actions contravened K.S.A. § 44–319(a), which was set forth in the promissory notes discussion. Herr argues that neither state nor federal law authorized these deductions, that the deductions were not for medical or hospital services, and that he did not sign an authorization for McCormick Grain to make the deductions. The plaintiff contends he and other grain merchandisers challenged the deduction of interest from their commissions. Herr adds that even if he did sign an authorization, the purpose of the deductions did not accrue to his benefit. The plaintiff compares McCormick Grain's deductions to those deductions identified in K.A.R. § 49–20–1(a)(2)(A) as not accruing to the employee's benefit: "Deductions made for cash and inventory shortages; breakage; returned checks or bad credit card sales; losses to employers resulting from burglaries, robberies, or alleged negligent acts." *See Excel Corp. v. Kansas Dep't of Human Resources,* 12 Kan.App.2d 417, 747 P.2d 179 (1987).

Herr declares McCormick Grain's withholding of these amounts was an attempt "to shift its own bad debt losses" to him. (Pltf.'s Memo., at 51.)

The defendants rely upon K.S.A. § 44–319(a)(3), arguing these deductions were authorized under the KWPA because the promissory notes memorialized the late 1979/early 1980 employment contract, which specified Herr would be held liable for his pro rata share of losses on grain contracts into which he entered.

Herr "vigorously denies" he gave oral authorization for the withholding. (Pltf.'s Reply, at 59.) He adds that even if he had given oral authorization, such authorization would be inadequate because the statute specifically requires written authorization. Additionally, the plaintiff disagrees the promissory notes represent written authorization.

Even if Herr agreed to be responsible for his pro rata share of losses, there is no evidence he authorized McCormick Grain to withhold such losses from his commissions. The language of the promissory notes does not authorize McCormick Grain to withhold losses from the plaintiff's commissions. The claim is not ripe for summary judgment, however, because of the factual discrepancies and lack of concreteness concerning the various withholdings.

#### D. *Heiman's Personal Liability*

In his amended complaint, Herr alleged Heiman is liable personally because McCormick Grain is Heiman's alter ego. Heiman subsequently filed a motion for summary judgment, arguing Herr cannot pierce the corporate veil to attach personal liability to him.

■ With regard to piercing the corporate veil in the ERISA context, Heiman found no Tenth Circuit decision on point and

---

10. In his argument section of the memorandum, Herr does not explain the basis for the $20,237.37 figure. Reviewing the facts gives the following possibility. Pursuant to McCormick Grain's breakdown summary sheets for 1989, 1990, and 1991, under the "Other" column, the company deducted $4,222.20 in 1989, $4,601.13 in 1990, and $5,628.32 in 1991, for a total of $14,451.65. Herr also claims McCormick Grain deducted a total of $5,785.72 in 1989, 1990, and 1991, for repayment of an advance, which was in actuality a sales loss. $14,451.65 + $5,765.72 = $20,237.37. The March 15, 1989, entry reflects a sales loss of $11,792.42 and a business advance of $12,750.00. This court is unable to follow how Herr came up with the $5,785.72 figure.

directs this court to cases from other circuits. The defendant primarily relies upon *United Elec. Workers v. 163 Pleasant St. Corp.,* 960 F.2d 1080 (1st Cir.1992). Herr concurs with the standard set forth in this First Circuit case.

In *United Elec. Workers,* the court noted that "in federal question cases, courts are wary of allowing the corporate form to stymie legislative policies." *Id.* at 1091. Thus, in deciding which veil-piercing test is appropriate, federal courts should " 'look closely at the purpose of the federal statute to determine whether the statute places importance on the corporate form, an inquiry that usually gives less respect to the corporate form than does the strict common law alter ego doctrine.' " *Id.* at 1092 (quoting *Town of Brookline v. Gorsuch,* 667 F.2d 215, 221 (1st Cir.1981)). The First Circuit concluded "that in disputes involving workers' claims to ERISA benefits, ... a federal court should apply a federal common law standard of corporate separateness." *Id.* The court reasoned legislative intent dictated "a modicum of corporate disregard in ERISA cases" because "Congress enacted ERISA to protect the interests of employee benefit plan participants and their beneficiaries." *Id.* (citation omitted); *see Lumpkin v. Envirodyne Indus., Inc.,* 933 F.2d 449, 461 (7th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991) (quoting *Pension Benefit Guar. Corp. v. Ouimet Corp.,* 711 F.2d 1085, 1093 (1st Cir.), *cert. denied* 464 U.S. 961, 104 S.Ct. 393, 78 L.Ed.2d 337 (1983)) ("[T]he congressional intent of ERISA is to hold employers responsible for pension benefits, so that when the corporate form poses a bar to liability, 'concerns for corporate separateness are secondary to what we view as the mandate of ERISA.' "). The First Circuit Court of Appeals then set forth the following standard: "(1) whether the parent and the subsidiary ignored the independence of their separate operations, (2) whether some fraudulent intent existed on the principals' part, and (3) whether a substantial injustice would be visited on the proponents of veil piercing should the court validate the corporate shield." *United Elec. Workers,* 960 F.2d at 1093 (citations omitted).

Subsequent to the filing of Heiman's motion, but prior to the filing of Herr's response and of the defendant's reply, the Tenth Circuit addressed the standard set forth in *United Elec. Workers.* In *N.L.R.B. v. Greater Kansas City Roofing,* 2 F.3d 1047 (10th Cir.1993), a case in which the National Labor Relations Board (NLRB) attempted to pierce the corporate veil, the court stated:

In accordance with prior Tenth Circuit precedent and after careful consideration of the analysis of this issue offered by our sister courts, we conclude that the federal common law doctrine of piercing the corporate veil under an alter ego theory can best be described by the following two-part test: (i) was there such unity of interest and lack of respect given to the separate identity of the corporation by its shareholders that the personalities and assets of the corporation and the individual are indistinct, and (ii) would adherence to the corporate fiction sanction a fraud, promote injustice, or lead to an evasion of legal obligations.

. . . .

Other circuits have articulated a similar test as three factors, although the second and third factors are really just commonly incurred variations on the equitable theme addressed in the second prong of our test. . . .

Several circuits have determined that all three ... factors must be met in order to justify piercing the corporate veil. *See [United Elec. Workers v.] 163 Pleasant St. Corp.,* 960 F.2d at 1093; *[United Steelworkers of America v.] Connors Steel Co.,* 855 F.2d [1499,] 1507 [ (11th Cir.1988), *cert. denied,* 489 U.S. 1096, 109 S.Ct. 1568, 103 L.Ed.2d 935 (1989) ]. Those circuits would require proof of both fraud and injustice whereas the second prong of the test as we have articulated it is satisfied if adherence to the corporate structure would either sanction fraud *or* promote injustice in light of the shareholder's disregard of separate corporate identity. However, we do not find this difference to be very significant. First, the First and Eleventh Circuits utilized such broad definitions of fraud and injustice that while they consider the two

factors to merit separate inquiries, they essentially constitute a single factor. Second, given the nature of the two factors, it would be unusual to find fraud in a particular case without also finding injustice. Third, as we have set forth, piercing the corporate veil is an equitable remedy. We find it sufficient to require that a party seeking to pierce the corporate veil show that there was a substantial disregard for the separate corporate identity, and that there is a compelling equitable reason for the court to expose the shareholder to personal liability in the form of fraud, injustice, or evasion of legal obligations flowing from the disregard of the separate corporate identity.

2 F.3d at 1052, 1054–55 (citations omitted).[11]

Although *Greater Kansas City Roofing* was not an ERISA case, the Tenth Circuit did not limit the two-part test to cases involving the NLRB. Thus, this court will follow the test set forth in *Greater Kansas City Roofing*.

According to the Tenth Circuit Court of Appeals, "strong public policy reasons" dictate "upholding the corporate fiction" because stockholders, who follow the rules governing corporations, "are entitled to rely on the protection of limited liability that the corporation affords." 2 F.3d at 1052. In discussing whether a separate corporate identity existed, the court examined the following factors: "(i) the degree to which the corporate legal formalities have been maintained, and (ii) the degree to which individual and corporate assets and affairs have been commingled." *Id.*

 Herr concedes McCormick Grain observed all requisite corporate formalities, including the fact that directors and stockholders met at least annually.

With regard to commingling of individual and corporate assets and affairs, the uncontroverted facts show McCormick Grain, a for-profit-corporation, has been authorized to do business in the State of Kansas since 1975. McCormick Grain had directors, officers, and stockholders other than the defendant. For example, from May 1980 until May 1985, Timothy Bennett, a grain merchandiser and corporate officer, owned 20% of the stock and attended board meetings. When Bennett left McCormick Grain, the corporation purchased his stock. As of 1991, all McCormick Grain stock was distributed among Heiman and family members. Corporate officers other than Heiman routinely exerted "corporate authority" over McCormick Grain's business affairs. (Heiman's Motion, Fact No. 11; Pltf.'s Response, at 6.)

Heiman also maintains that there was no evidence McCormick Grain was capitalized inadequately or its assets looted; that stockholders, officers, and directors other than himself made pension plan decisions; that he only had a "vague familiarity" with many of McCormick Grain's important decisions; and that McCormick Grain's funds always have been deposited in McCormick Grain's accounts. (Heiman's Motion, at 10–11.)

Herr attempts to controvert the defendant's claim that McCormick Grain was capitalized adequately. Both parties rely upon the deposition testimony of Timothy Bennett, Paul Herr, and the plaintiff. Bennett testified McCormick Grain was capitalized adequately during his tenure with the company. According to Paul Herr, a controller, McCormick Grain normally had sufficient funds "to carry out its corporate duties in the business for which it was created" during his tenure with the company. (Heiman's Motion, Ex. E.) The plaintiff could recall one time during his 12 years when McCormick Grain had a problem with sufficient capital. An in-

---

**11.** *Greater Kansas City Roofing* was decided on August 17, 1993. One week later, on August 24, 1993, the Tenth Circuit handed down *Frank v. U.S. West, Inc.*, 3 F.3d 1357 (10th Cir.1993), a case involving federal employment discrimination claims. At issue was whether the defendant corporation was liable for the acts of its subsidiary. The Tenth Circuit Court of Appeals noted: "Depending on the facts of the case before them, the courts have applied four different tests to determine whether a parent corporation is liable for the acts of its subsidiary." *Id.* at 1362. The court listed those four tests as agency, alter ego, instrumentality, and integrated enterprise. The court declined "to adopt any one of these tests as the exclusive test for use in all employment discrimination cases." *Id.* Upon joint recommendation of the parties, the court applied the integrated enterprise test.

crease in grain prices impacted McCormick Grain's capital and limited the grain merchandisers' "ability to purchase and hedge on an up market." (Heiman's Motion, Ex. F, at 145.)

To show a genuine issue of material fact and avoid summary judgment, a nonmovant who has the burden of proof at trial, as is the case with Herr, must respond to the summary judgment motion with specific and supported facts. The nonmovant must present sufficient competent evidence that would support a verdict in its favor. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); Fed. R.Civ.P. 56. "Conclusory allegations will not suffice to create a genuine issue. There must be more than a 'scintilla of evidence,' and more than 'some metaphysical doubt as to the material facts.'" *Delaware & Hudson Ry. v. Consolidated Rail Corp.,* 902 F.2d 174, 178 (2d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2041, 114 L.Ed.2d 125 (1991) (quoting *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512, and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)). Herr fails to raise a genuine issue of material fact concerning the capitalization of McCormick Grain.

Herr argues Heiman did loot McCormick Grain's resources. The plaintiff claims Heiman required McCormick Grain's executive vice presidents to do work for other corporations or businesses in which Heiman had an interest, and that Heiman's other corporations or businesses did not compensate McCormick Grain for the use of its employees. Heiman's testimony, upon which Herr relies, does not indicate McCormick Grain executive vice presidents were *required* to do work for Heiman's other businesses. Heiman testified that Bennett assisted him in managing the other businesses. There also was evidence Heiman's son, Jeffrey, performed similar functions.

The plaintiff also maintains Heiman showed scant regard for McCormick Grain as a separate entity concerning the establishment and operation of Heiman Leasing. According to the plaintiff, Heiman stated Heiman Leasing was one of McCormick Grain's activities whereas another of McCormick Grain's directors referred to McCormick Grain and Heiman Leasing as separate companies. Herr, however, fails to cite to the record to support the statement attributed to Heiman. Jeffrey Heiman, one of the sons involved in the family business, testified Heiman Leasing was a subpart of McCormick Grain, a separate company. Jeffrey did not state Heiman Leasing was a separate corporation. Heiman contends Herr does not understand McCormick Grain's corporate structure. As reflected in its "Schedule of Gross Margins, Income Tax Accrual Basis" for 1991 through 1993, McCormick Grain's business activities include more than grain merchandising. For example, two of the other activities listed are cattle and lease income.

Heiman owned cattle and placed those cattle at feedlots that purchased grain (or that Heiman hoped would purchase grain) from McCormick Grain. Herr emphasizes that McCormick Grain's feedlot customers did not distinguish between McCormick Grain and Heiman, and that Heiman owning cattle enhanced McCormick Grain's business. In reply, Heiman acknowledges both he and McCormick Grain owned cattle. The defendant points out that Herr has not offered any evidence suggesting Heiman commingled the profits or costs of cattle he owned with the profits or costs of cattle McCormick Grain owned.

The plaintiff argues Heiman and McCormick Grain were one and the same because commissions on accounts designated as company accounts were credited to Heiman regardless of whether Heiman actually entered into the contract. Other grain merchandisers would not receive a commission from contracts entered into with company accounts unless they were the merchandiser on the matching contract. Heiman replies the company accounts were his customers in his capacity as a grain merchandiser.

Herr maintains Heiman's sons improperly used the lake house McCormick Grain owns for their own personal enjoyment without compensating McCormick Grain. The defendant explains McCormick Grain purchased a

lake house and two lots. The two lots subsequently were sold at a profit; McCormick Grain, not Heiman, was credited with that profit. The lake house also is used to entertain customers. Heiman claims, without citing to the record for support, that the IRS examined the use of the lake house and found it an appropriate taxable asset for McCormick Grain and that McCormick Grain maintains a record of who uses the lake house.

Heiman's final argument is that Herr has not offered "any evidence whatsoever that the financial profit and losses; accounts; ownership in property or other items between Heiman and McCormick [Grain] were treated as anything other than separate and distinct property." (Heiman's Reply, at 9.)

Herr has failed to offer sufficient competent evidence of Heiman's substantial disregard for McCormick Grain's separate corporate identity. Consequently, it is not necessary to address the parties' fraud and manifest injustice arguments.

■ Alternatively, Herr argues Heiman is liable for the plaintiff's ERISA claim as a trade or business under common control. According to Herr, McCormick Grain and Heiman's grain merchandising sole proprietorship were the two businesses under Heiman's common control. *See* 29 U.S.C. § 1002(40)(B)(i) ("two or more trades or businesses, whether or not incorporated, shall be deemed a single employer if such trades or businesses are within the same control group"); 29 U.S.C. § 1002(40)(B)(iii) ("the determination of whether a trade or business is under 'common control' with another trade or business shall be determined" in the same manner as provided for in § 1301(b) of this title).

The statutes to which Herr cites are not applicable to the instant facts. In the context of congressional concern regarding contributing employers withdrawing from a multiemployer pension plan, 29 U.S.C. § 1001a, § 1002(40)(B) expounds upon the definition of "multiple employer welfare arrangement" beginning at 29 U.S.C. § 1002(40)(A).

■ With regard to piercing the corporate veil in the KWPA contest, Heiman relies upon, and Herr concurs with, the eight factors set forth in *Kvassay v. Murray,* 15 Kan.App.2d 426, 808 P.2d 896 (1991), and *U.S. v. MPM Contractors, Inc.,* 763 F.Supp. 488 (D.Kan.1991). According to these cases, under Kansas law, the following factors warrant consideration in deciding whether to disregard the corporate structure:

> (1) undercapitalization of a one-man corporation, (2) failure to observe corporate formalities, (3) nonpayment of dividends, (4) siphoning of corporate funds by the dominant stockholder, (5) nonfunctioning of other officers or directors, (6) absence of corporate records, (7) use of the corporation as a facade for operations of the dominant stockholder or stockholders, and (8) use of the corporate entity in promoting injustice or fraud.

*Kvassay,* 15 Kan.App.2d 426, Syl. ¶ 7, 808 P.2d 896; *see MPM Contractors, Inc.,* 763 F.Supp. at 495.

The undercapitalization factor has been addressed. Additionally, Heiman directs this court to its financial statement as proof of a substantial capital basis. As of its fiscal year ending March 31, 1992, McCormick Grain "had estimated retained earnings of $716,082." (Heiman's Motion, Fact No. 15; Pltf.'s Response, at 7.)

Regarding failure to observe corporate formalities, Herr contends the corporate minute book reflects that the directors and stockholders only met once between 1983 and 1988 and that during that period of time McCormick Grain forfeited its corporate charter for more than one year because McCormick Grain failed to file an annual report. The plaintiff does not cite to the record or produce the corporate minute book to support these contentions. Moreover, Herr failed to controvert Heiman's statement of fact that corporate formalities had been observed. (Heiman's Motion, Fact. No. 12; Pltf.'s Response, at 6.) Heiman adds that McCormick Grain held annual meetings and observed corporate formalities for the applicable statute of limitations time frame involving Herr's KWPA claim.

Both parties agree McCormick Grain has never paid dividends.

Herr maintains Heiman has siphoned corporate funds by requiring employees to perform work for his other businesses, by using McCormick Grain's office space and equipment to manage his other businesses, and by allowing McCormick Grain to contribute substantial pension plan benefits on his behalf. The plaintiff maintains the pension plan contributions were improper. Heiman replies that the businesses in question were McCormick Grain businesses and that these activities, other than the pension plan benefits, profited McCormick Grain. The defendant states the only way he profited was through stock ownership.

With regard to nonfunctioning of other officers or directors, Herr cites to incidents of Heiman's involvement, i.e., Heiman signed all the pension plan documents; Heiman was the trustee of at least one of the pension plans; Heiman participated in the hiring of grain merchandisers; and Heiman obtained or directed the obtaining of group health insurance bids. The fact that Heiman was involved actively in managing McCormick Grain does not mean necessarily that other officers or directors were nonfunctioning. In fact, the plaintiff cites to Bennett's testimony that he and Heiman "basically ran the company." (Pltf.'s Response at 19, & Ex. A at 33.) Bennett testified he actively participated in McCormick Grain's corporate affairs. Moreover, Herr failed to controvert Heiman's statement of fact that corporate officers other than Heiman "routinely exercised corporate authority over [McCormick Grain's] business affairs." (Heiman's Motion, Fact No. 11; Pltf.'s Response, at 6.)

The absence of corporate records factor has been addressed in the discussion on observing corporate formalities.

Herr maintains Heiman, as the dominant stockholder, used McCormick Grain as a facade for Heiman's operations. In other words, the plaintiff claims Heiman intermixed his personal business with McCormick Grain's business to such an extent customers and other corporate officers were confused about what was what. Herr also points to his affidavit in which he avows "Heiman respond[ed] to questions or criticism by grain merchandisers with statements to the effect

that 'McCormick Grain is my company and I can do what I want.'" (Pltf.'s Response, Ex. I.) This does not appear to rise to the level discussed in *Kvassay*, 15 Kan.App.2d at 439, 808 P.2d 896, in which the court found the corporation had been used as a facade based upon the dominant stockholder's "complete failure to keep corporate records or to abide by corporate formalities, combined with the history of unexplained transfers of funds."

The last factor concerns whether Heiman used the corporate entity in promoting fraud or injustice. Herr maintains fraudulent intent is evidenced by the fact Heiman and McCormick Grain "repeatedly and intentionally misled" the grain merchandisers, including Herr, "regarding the appropriateness of their classification as independent contractors rather than employees." (Pltf.'s Response, at 9.) As found in this court's October 25, 1993, memorandum and order, Heiman and McCormick Grain

repeatedly informed the merchandisers the appropriate authorities, including the company's attorneys, auditors, the Internal Revenue Service (IRS), and other governmental agencies, had reviewed and approved classifying McCormick Grain merchandisers as independent contractors. The defendants did not seek review and approval of the classification; however, in a 1990–91 audit, the IRS raised the issue.

*Herr v. McCormick Grain*, No. 92–1321, at 20, 1993 WL 444304 (D.Kan. Oct. 25, 1993). Heiman points to the fact the IRS audited McCormick Grain several times during the 12 years Herr worked there without raising the issue, thereby implicitly approving the classification.

Herr also argues fraud is evidenced by the fact Heiman was provided with pension plan benefits even though the plan was only open to employees and grain merchandisers were classified as independent contractors, not employees. Heiman worked in the capacity of a grain merchandiser, and in a response to an interrogatory, the defendants stated Heiman was not considered an employee. In reply, the defendant asserts there is no evidence a corporate officer conducting substantial non-merchandising work for McCormick Grain, such as himself, is not eligible to participate

in the pension plans. Heiman also declares there is no evidence either of the plans were maintained with a fraudulent intent.

According to the plaintiff, another indicia of fraud is that Heiman looted McCormick Grain's resources and allowed the lake house to be used for his family's personal enjoyment. This argument already has been addressed.

Herr's final assertion is that manifest injustice would result if the corporate veil is not pierced because McCormick Grain may not have the resources to pay his claims, providing he wins. Herr points out that his claims are more than one-half of McCormick Grain's net worth, as denoted by its March 31, 1992 financial statement. The plaintiff suggests that the market could affect McCormick Grain's net worth, or that Heiman, who has the authority to do so, could "strip" McCormick Grain of its assets. (Pltf.'s Response, at 14.) The basis for Herr's assertion is speculation. Additionally, Heiman replies that McCormick Grain's net worth has increased since the 1992 financial statement.

"Power to pierce the corporate veil is to be exercised reluctantly and cautiously." *Amoco Chemicals Corp. v. Bach,* 222 Kan. 589, Syl. ¶ 3, 567 P.2d 1337 (1977). After considering all the factors, this court finds Herr cannot pierce the corporate veil.

 With regard to piercing the corporate veil in the context of the FLSA, Heiman states he was unable to locate a Tenth Circuit case setting forth the appropriate alter ego standard. The defendant suggests, and Herr concurs, the standard would fall between the federal common-law, two-prong test and the eight Kansas factors. Thus, if Herr is unable to pierce the corporate veil under either of those standards, the plaintiff will not be able to pierce the corporate veil in the context of the FLSA.

This court grants Heiman's motion for summary judgment, finding this case does not warrant disregard of the corporate structure.

IT IS ACCORDINGLY ORDERED this 15 day of December, 1993, that plaintiff Herr's motion for reconsideration (Dkt. No. 72) is denied.

IT IS FURTHER ORDERED that defendant McCormick Grain's partial motion for summary judgment concerning the promissory notes counterclaim (Dkt. No. 55) is denied with regard to the two promissory notes based upon losses incurred as a result of the Follett Feedyard and Wolfe Grain contracts, and is granted with regard to the $2,300.00 promissory note based upon the commission advance to Herr.

IT IS FURTHER ORDERED that plaintiff Herr's motion for summary judgment (Dkt. No. 56) is denied.

IT IS FURTHER ORDERED that defendant Heiman's motion for partial summary judgment (Dkt. No. 53) is granted.

## *MEMORANDUM AND ORDER ON RECONSIDERATION*

This matter comes before the court on plaintiff Samuel E. Herr's motion for reconsideration. Herr disagrees with this court's ruling that his Kansas Wage Payment Act (KWPA) claim is not ripe for summary judgment and with the decision to grant defendant James L. Heiman's motion for partial summary judgment pursuant to the plaintiff's Fair Labor Standards Act (FLSA) claim. *See* page 1503.

 In *Van Skiver v. United States,* 952 F.2d 1241, 1243 (10th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 89, 121 L.Ed.2d 51 (1992), the Tenth Circuit Court of Appeals discussed motions to reconsider, stating:

> The Federal Rules of Civil Procedure do not recognize a "motion to reconsider." Instead, the rules allow a litigant subject to an adverse judgment to file either a motion to alter or amend the judgment pursuant to Fed.R.Civ.P. 59(e) or a motion seeking relief from the judgment pursuant to Fed.R.Civ.P. 60(b). These two rules are distinct; they serve different purposes and produce different consequences. Which rule applies to a motion depends essentially on the time a motion is served. If a motion is served within ten days of the rendition of judgment, the motion ordinarily will fall under Rule 59(e). If the motion

is served after that time it falls under Rule 60(b).

(Citations omitted.) Herr's motion was filed within 10 days of the order.[1] Thus, this court will treat the motion for reconsideration as falling under Rule 59(e), a motion to alter or amend a judgment. *See Northern Cheyenne Tribe v. Hodel,* 851 F.2d 1152, 1155 (9th Cir.1988) ("A motion for reconsideration of a summary judgment is appropriately brought under Rule 59(e)."); *see also Koch v. Shell Oil Co.,* 1993 WL 393763, * 1 (D.Kan. 1993).

It is within the district court's discretion whether to grant a motion for reconsideration. *Hancock v. City of Oklahoma City,* 857 F.2d 1394, 1395 (10th Cir.1988).

> It is the general rule that a motion to reconsider is the opportunity for the court to correct manifest errors of law or fact and to review newly discovered evidence. Appropriate circumstances for a motion to reconsider are where the court has obviously misapprehended a party's position, the facts or the law, or mistakenly has decided issues outside of those the parties presented for determination.

*Foutty v. Equifax Services, Inc.,* 764 F.Supp. 621, 622 (D.Kan.1991) (citations omitted).

Herr disagrees his KWPA claim is not ripe "because of the factual discrepancies and lack of concreteness concerning the various withholdings." *See* page 1515. He maintains there is no dispute McCormick Grain withheld $19,778.98 from his paychecks, arguing there are no factual discrepancies or lack of concreteness concerning the amount of and the reason for the withholdings. The plaintiff argues these withholdings are a per se violation of K.S.A. 44–319(a) because the withholdings at issue do not fall within any of the statutory authorizations.

McCormick Grain responds that Herr is advancing the same arguments this court previously rejected. With regard to the merits of Herr's argument, McCormick Grain does not dispute the amounts withheld; rather, it contends there is a factual dispute concerning the amount of commissions, as defined pursuant to K.S.A.1992 Supp. 44–341(b), Herr earned. Additionally, McCormick Grain alleges Herr controlled the amount withheld from his paycheck each commission period.

This court previously ruled the plaintiff could not pierce the corporate veil to attach personal liability to Heiman. Herr now alleges it is not necessary to pierce the corporate veil to find Heiman personally liable for the plaintiff's FLSA claim because Heiman was in "operational control" of McCormick Grain.

 McCormick Grain argues Herr is advancing a new legal theory that could have been raised previously. Furthermore, according to McCormick Grain, the Tenth Circuit Court of Appeals has not adopted the operational control test.

 Rule 59(e) does not permit the losing litigant to rehash arguments previously addressed and rejected or to present new legal theories or facts that could have been raised earlier. *National Metal Finishing Co., Inc. v. BarclaysAmerican/Commercial, Inc.,* 899 F.2d 119, 123 (1st Cir.1990); *Van Skiver v. United States,* 751 F.Supp. 1522, 1523 (D.Kan.1990), *aff'd,* 952 F.2d 1241 (10th Cir. 1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 89, 121 L.Ed.2d 51 (1992). This court finds McCormick Grain's response persuasive and denies Herr's motion for reconsideration.

IT IS ACCORDINGLY ORDERED this 19 day of January, 1994, that plaintiff Herr's motion for reconsideration (Dkt. No. 76) is denied.

The next status conference in this matter is scheduled on January 21, 1994, at 3:30 p.m.

---

**1.** The Memorandum and Order was filed December 15, 1993. Herr filed his motion on December 29, 1993. *See* Fed.R.Civ.P. 6(a).